CHAMPLIN REFINING CO. *v.* CORPORATION COMMISSION OF OKLAHOMA ET AL.*

No. 122.   Argued March 23, 1932.—Decided May 16, 1932.

---

* Together with No. 485, *Champlin Refining Co.* v. *Corporation Commission of Oklahoma et al.;* and No. 486, *Corporation Commission of Oklahoma et al.* v. *Champlin Refining Co.*

212

*Messrs. Harry O. Glasser* and *James M. Beck,* with whom *Messrs. George S. Ramsey, Horace G. McKeever,* and *Edgar A. DeMeules* were on the brief, for the Champlin Refining Co.

214

218

*Messrs. W. P. Z. German* and *John H. Miley,* with whom *Messrs. J. Berry King,* Attorney General of Oklahoma, *Jess L. Ballard,* Assistant Attorney General, and *E. S. Ratliff* were on the brief, for the Corporation Commission of Oklahoma et al.

222

MR. JUSTICE BUTLER delivered the opinion of the Court.

The refining company by this suit seeks to enjoin the commission, attorney general and other state officers from enforcing certain provisions of c. 25 of the laws of Oklahoma enacted February 11, 1915,* and certain orders of

---

* C. O. S. 1921, §§ 7954–7963.

§ 1. That the production of crude oil or petroleum in the State of Oklahoma, in such a manner and under such conditions as to constitute waste, is hereby prohibited. [§ 7954.]

§ 2. That the taking of crude oil or petroleum from any oil-bearing sand or sands in the State of Oklahoma at a time when there is not a market demand therefor at the well at a price equivalent to the actual value of such crude oil or petroleum is hereby prohibited, and the actual value of such crude oil or petroleum at any time shall be the average value as near as may be ascertained in the United States at retail of the by-products of such crude oil or petroleum when refined less the cost and a reasonable profit in the business of transporting, refining and marketing the same, and the Corporation Commission of this State is hereby invested with the authority and power to investigate and determine from time to time the actual value of such crude oil or petroleum by the standard herein provided, and when so determined said Commission shall promulgate its findings by its orders duly made and recorded, and publish the same in some newspaper of general circulation in the State. [§ 7955.]

§ 3. That the term " waste " as used herein, in addition to its ordinary meaning, shall include economic waste, underground waste, surface waste, and waste incident to the production of crude oil or petroleum in excess of transportation or marketing facilities or reasonable market demands. The Corporation Commission shall have authority to make rules and regulations for the prevention of such wastes, and for the protection of all fresh water strata, and oil and gas bearing strata, encountered in any well drilled for oil. [§ 7956.]

§ 4. That whenever the full production from any common source of supply of crude oil or petroleum in this State can only be obtained under conditions constituting waste as herein defined, then any per-

the commission on the ground that they are repugnant to the due process and equal protection clauses of the Fourteenth Amendment and the commerce clause. The district court consisting of three judges, 28 U. S. C., § 380, denied plaintiff's application for a temporary injunction, and No. 122 is plaintiff's appeal from such refusal. As final judgment has been entered, this appeal will be dismissed. The final decree sustains certain regu-

son, firm or corporation, having the right to drill into and produce oil from any such common source of supply, may take therefrom only such proportion of all crude oil and petroleum that may be produced therefrom, without waste, as the production of the well or wells of any such person, firm or corporation, bears to the total production of such common source of supply. The Corporation Commission is authorized to so regulate the taking of crude oil or petroleum from any or all such common sources of supply, within the State of Oklahoma, as to prevent the inequitable or unfair taking, from a common source of supply, of such crude oil or petroleum, by any person, firm, or corporation, and to prevent unreasonable discrimination in favor of any one such common source of supply as against another. [§ 7957.]

§ 5. That for the purpose of determining such production, a gauge of each well shall be taken under rules and regulations to be prescribed by the Corporation Commission, and said Commission is authorized and directed to make and promulgate, by proper order, such other rules and regulations, and to employ or appoint such agents with the consent of the Governor, as may be necessary to enforce this act. [§ 7958.]

§ 6. That any person, firm, or corporation, or the Attorney General on behalf of the State, may institute proceedings before the Corporation Commission, or apply for a hearing before said Commission, upon any question relating to the enforcement of this act, and jurisdiction is hereby conferred upon said Commission to hear and determine the same. Said Commission shall set a time and place, when and where such hearing shall be had and give reasonable notice thereof to all persons or classes interested therein, by publication in some newspaper or newspapers, having general circulation in the State, and in addition thereto, shall cause reasonable notice in writing to be served personally on any person, firm or corporation complained against. In the exercise and enforcement of such jurisdiction, said Commission is authorized to determine any question or fact, arising hereunder, and to summon witnesses, make ancillary orders, and use mesne and final

latory provisions of the Act but declares invalid some of its penal clauses. 51 F. (2d) 823. No. 485 is plaintiff's appeal from the first mentioned portion of the decree and No. 486 is defendants' appeal from the other part.

## No. 485.

The Act prohibits the production of petroleum in such a manner or under such conditions as constitute waste.

process, including inspection and punishment as for contempt, analogous to proceedings under its control over public service corporations, as now provided by law. [§ 7959.]

§ 7. That appellate jurisdiction is hereby conferred upon the Supreme Court in this State to review the action of said Commission in making any order, or orders, under this act. Such appeal may be taken by any person, firm or corporation, shown by the record to be interested therein, in the same manner and time as appeals are allowed by law from other orders of the Corporation Commission. Said orders so appealed from shall not be superseded by the mere fact of such appeal being taken, but shall be and remain in full force and effect until legally suspended or set aside by the Supreme Court. [§ 7960.]

§ 8. That in addition to any penalty that may be imposed by the Corporation Commission for contempt, any person, firm, or corporation, or any officer, agent or employee thereof, directly or indirectly violating the provisions of this act, shall be guilty of a misdemeanor, and upon conviction thereof, in a court of competent jurisdiction, shall be punished by a fine in any sum not to exceed five thousand dollars ($5,000.00), or by imprisonment in the county jail not to exceed thirty (30) days, or by both fine and imprisonment. [§ 7961.]

§ 9. That in addition to any penalty imposed under the preceding section, any person, firm or corporation, violating the provisions of this act, shall be subject to have his or its producing property placed in the hands of a receiver by a court of competent jurisdiction, at the suit of the State through the Attorney General, or any county attorney, but such receivership shall only extend to the operating of producing wells and the marketing of the production thereof, under the provisions of this act. [§ 7962.]

§ 10. That the invalidity of any section, sub-division, clause or sentence of this act shall not in any manner effect [sic] the validity of the remaining portion thereof. [§ 7963.]

§ 1. Section 3 defines waste to include—in addition to its ordinary meaning—economic, underground and surface waste, and waste incident to production in excess of transportation or marketing facilities or reasonable market demands, and empowers the commission to make rules and regulations for the prevention of such wastes. Whenever full production from any common source can only be obtained under conditions constituting waste, one having the right to produce oil from such source may take only such proportion of all that may be produced therefrom without waste as the production of his wells bears to the total. The commission is authorized to regulate the taking of oil from common sources so as to prevent unreasonable discrimination in favor of one source as against others. § 4. Gauges are to be taken for the purpose of determining production of wells. And the Commission is directed to promulgate rules and regulations and to appoint such agents as may be necessary to enforce the Act. § 5. Since the passage of the Act the commission has from time to time made "proration orders."

The court made its findings, which, so far as need be given here, are indicated below:

Plaintiff is engaged in Oklahoma in the business of producing and refining crude oil and transporting and marketing it and its products in intrastate and interstate commerce. It has oil and gas leases in both the Greater Seminole and the Oklahoma City fields. In each field it has nine wells. It owns a refinery having a daily capacity of 15,000 barrels of crude and there produces gasoline and other products. It has approximately 735 tank cars, operates about 470 miles of pipeline including adequate facilities for the transportation of crude oil from the fields to its refinery, and has about 256 wholesale and 263 retail gasoline stations in Oklahoma and other States which are supplied from its refinery. At the refinery it has gas-

tight steel storage tanks with a total capacity of about 645,000 barrels. It does not use earthen storage or permit its crude to run at large or waste any oil produced at its wells. All that it can produce will be utilized for commercial purposes. It also purchases much oil.

The Greater Seminole area covers a territory fifteen to twenty by eight to ten miles and has eight or more distinct pools in formations which do not overlie each other. The first pool was discovered in 1925 and by June 15, 1931, there were 2141 producing wells having potential production of 564,908 barrels per day. The wells are separately owned and operated by 80 lessees. About three-fourths of them, owning wells with 40 per cent. of the total potential capacity of the field, have no pipelines or refineries and are entirely dependent for an outlet for their crude upon others who purchase and transport oil. Five companies, owning wells with about 13 per cent. of the potential production, have pipelines or refinery connections affording a partial outlet for their production. Nineteen other companies own or control pipelines extending into this area having a daily capacity of 468,200 barrels, and most of them from time to time purchase oil from other producers in the field.

The Oklahoma City field, about 65 miles west of the Seminole, is about six by three miles and part of it has been divided into small lots. All of plaintiff's leases are in that portion of the field. Oil was discovered there in December, 1928, and is being produced from four different formations more than 6,000 feet below the surface. In some parts of the area two or more overlie each other, and at many points the wells penetrate all overlying formations and are capable of producing from all of them. The field is not yet fully developed. June 15, 1931, there were 746 producing wells, having an estimated potential of 2,987,993 barrels per day. These wells are owned by 53 different lessees. Thirty-six of them are wholly, and

eight are partially, nonintegrated; they operate wells having about 90 per cent. of total potential production. The ten producing companies control pipelines extending into this area with a carrying capacity of only 316,000 barrels per day. Most of them from time to time purchase oil from other producers there.

Crude oil and natural gas occur together or in close proximity to each other, and the gas in a pool moves the contents toward the point of least resistance. When wells are drilled into a pool the oil and gas move from place to place. If some of the wells are permitted to produce a greater proportion of their capacity than others, drainage occurs from the less active to the more active. There is a heavy gas pressure in the Oklahoma City field. Where proportional taking from the wells in flush pools is not enforced, operators who do not have physical or market outlets are forced to produce to capacity in order to prevent drainage to others having adequate outlets. In Oklahoma prior to the passage of the Act, large quantities of oil produced in excess of transportation facilities or demand therefor were stored in surface tanks, and by reason of seepage, rain, fire and evaporation enormous waste occurred. Uncontrolled flow of flush or semi-flush wells for any considerable period exhausts an excessive amount of pressure, wastefully uses the gas and greatly lessens ultimate recovery. Appropriate utilization of gas energy is especially important in the Oklahoma City field where, because of the great depth of the wells, the cost of artificially recovering the oil would be very high.

The first of the present series of proration orders took effect August 1, 1927, and applied to the then flush and semi-flush pools in the Seminole. Similar orders have been in effect almost continuously since that time. Soon after the discovery of oil in the Oklahoma City field, production exceeded market demand there. The first proration order applicable in that field took effect October 15,

1929. Such orders usually covered short terms because of rapidly changing potential production and market demand from each of the pools.

All the proration orders attacked by plaintiff were made pursuant to §§ 1, 3, 4, 5 and 6 of the Act. Each, and the findings that it contained, were made after notice to all interested persons and were based upon evidence adduced at the hearings. The allegations of the complaint that the orders were made by the commission without having heard the testimony of witnesses under oath or any legal evidence were not sustained before the court.

The commission construes the Act as intended to empower it to limit production to the amount of the reasonable daily market demand and to require ratable production by all taking from the common source. In current orders it has found that waste of oil will result in the prorated areas unless production is limited to such demand. In order No. 5189, June 30, 1930, it found that the potential production in the United States was approximately 4,730,000 barrels per day and that imports amounted to about 300,000 barrels, creating a supply of over 5,000,000 barrels as against an estimated domestic and export demand of 2,800,000 barrels. And it found that the existing stocks of crude in storage exceeded the needs of the industry and that purchasers were unwilling to buy in Oklahoma for storage in any amount sufficient to take the surplus of potential production in that State. Similar findings are contained in the commission's subsequent orders.

Based on findings of the daily potential of the Oklahoma City field and the amount of the market outlet for oil there—that is, the amount that could be produced without waste as defined by the Act—plaintiff at the time of the trial was limited by the proration orders to about six per cent. of the total production of its wells in that field. And the orders also operated to restrict plaintiff

to much less than the potential production of its nine wells in the Seminole pools.

The court found that at all times covered by orders involved there was a serious potential overproduction throughout the United States and particularly in the flush and semi-flush pools in the Seminole and Oklahoma City fields; that, if no curtailment were applied, crude oil for lack of market demand and adequate storage tanks would inevitably go into earthen storage and be wasted; that the full potential production exceeded all transportation and marketing facilities and market demands; that accordingly it was necessary, in order to prevent waste, that production of flush and semi-flush pools should be restricted as directed by the proration orders, and that to enforce such curtailment, with equity and justice to the several producers in each pool, it was necessary to enforce proportional taking from each well and lease therein and that, upon the testimony of operators and others, a comprehensive plan of curtailment and proration conforming to the rules prescribed in the Act was adopted by the commission and was set forth in its orders.

The commission, acting under § 5 of the Act and with the consent of the governor of the State, appointed one Collins as its umpire and agent and constituted certain producers in each pool an operating committee to assist him in administering the prescribed rules and regulations. Later, one Bradford was appointed assistant umpire and agent. He spent all his time in the Oklahoma City field leaving Collins to serve in the other prorated areas. They supervised the taking of gauges, ascertained daily production of prorated wells, checked the same against quantities transported and kept complete records to the end that wells in each pool should be operated in accordance with the commission's rules and that violations be detected and reported. No appropriation had been made for the payment of umpires or agents. The commission did not have

sufficient regular help for the administration of the proration orders. Members of operators committees served without pay. Collins's salary and expenses have been paid by voluntary contributions of certain producers in the Seminole field and Bradford's by voluntary contribution of producers in the Oklahoma City field. In each field a great majority of the producers joined to raise such funds, and contributions were prorated on the basis of production. This method of paying for such help has been followed since 1927 and at all times has been known to the commission, the governor and the public. In that period there have been two sessions of the legislature, and it has not forbidden the practice or provided funds to pay for the work. Neither the umpire nor the members of the committee are public officers; they are mere agents or employees of the commission. The evidence does not establish that they have been guilty of favoritism or dishonesty or that the commission has acted arbitrarily or discriminated in favor of the groups paying such agents or that the plaintiff has suffered any injury by reason thereof.

The commission has not discriminated against the Oklahoma City field or any other prorated area nor in favor of the Seminole. The relation between potential production of each pool and the amount of crude oil that without waste could be produced therefrom was not the same in all prorated pools and therefore the applicable percentages of curtailment varied. The same pipelines and purchasers did not serve or take oil from all the pools, and in some the reasonable market demand was greater in proportion to potential production than in others. Some were prorated longer and had purchasers whose facilities do not extend to others. When oil was discovered in the Oklahoma City field the pools in the Seminole area were quite fully developed and some had passed flush production. The latter is a more favored location

in respect of trunk pipelines and has a larger market demand, although the daily production of the former is greater. The constant bringing in of new wells in the Oklahoma City field has resulted in a continuous and rapid increase in the potential production of that field, whereas market demand for oil there has increased very slowly.

None of the commission's orders has been made for the purpose of fixing the price of crude oil or has had that effect. When the first order was made the price was more than two dollars per barrel, but it declined until at the time of the trial it was only thirty-five cents. In each case the commission has allowed to be produced the full amount of the market demand for each pool. It has never entered any order under § 2 of the Act.

It was not shown that the commission intended to limit the amount of oil entering interstate commerce for the purpose of controlling the price of crude oil or its products or of eliminating plaintiff or any producer or refiner from competition, or that there was any combination among plaintiff's competitors for the purpose of restricting interstate commerce in crude oil or its products, or that any operators' committee made up of plaintiff's competitors formulated the proration orders.

The evidence before the trial court undoubtedly sustains the findings above referred to, and they are adopted here.

1. Plaintiff here insists that the Act is repugnant to the due process and equal protection clauses of the Fourteenth Amendment.

We need not consider its suggestion that the business of production and sale of crude oil is not a public service and that it does not devote its property to the public use. The proration orders do not purport to have been made, and in fact were not made, in respect of services or charges

of any calling so affected with a public interest as to be subject to regulation as to rates or prices.

Plaintiff insists that it has a vested right to drill wells upon the lands covered by its leases and to take all the natural flow of oil and gas therefrom so long as it does so without physical waste and devotes the production to commercial uses. But if plaintiff should take all the flow of its wells, there would inevitably result great physical waste, even if its entire production should be devoted to useful purposes. The improvident use of natural gas pressure inevitably attending such operations would cause great diminution in the quantity of crude oil ultimately to be recovered from the pool. Other lessees and owners of land above the pool would be compelled, for self-protection against plaintiff's taking, also to draw from the common source and so to add to the wasteful use of lifting pressure. And because of the lack, especially on the part of the non-integrated operators, of means of transportation or appropriate storage and of market demand, the contest would, as is made plain by the evidence and findings, result in surface waste of large quantities of crude oil.

In Oklahoma, as generally elsewhere, land owners do not have absolute title to the gas and oil that may permeate below the surface. These minerals, differing from solids in place such as coal and iron, are fugacious and of uncertain movement within the limits of the pool. Every person has the right to drill wells on his own land and take from the pools below all the gas and oil that he may be able to reduce to possession, including that coming from land belonging to others; but the right to take and thus to acquire ownership is subject to the reasonable exertion of the power of the State to prevent unnecessary loss, destruction or waste. And that power extends to the taker's unreasonable and wasteful use of natural gas

pressure available for lifting the oil to the surface and the unreasonable and wasteful depletion of a common supply of gas and oil to the injury of others entitled to resort to and take from the same pool. *Ohio Oil Co.* v. *Indiana*, 177 U. S. 190. *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 77. *Bandini Co.* v. *Superior Court*, 284 U. S. 8, 19 *et seq.; Brown* v. *Spilman*, 155 U. S. 665, 669. *Walls* v. *Midland Carbon Co.*, 254 U. S. 300, 323. *Rich* v. *Doneghey*, 71 Okla. 204; 177 Pac. 86. *People* v. *Associated Oil Co.*, 211 Cal. 93, 100 *et seq.;* 294 Pac. 717.

It is not shown that the rule for proration prescribed in § 4 or any other provision here involved amounts to or authorizes arbitrary interference with private business or plaintiff's property rights or that such statutory rule is not reasonably calculated to prevent the wastes specified in § 3.

We put aside plaintiff's contentions resting upon the claim that § 2 or § 3 authorizes or contemplates directly or indirectly regulation of prices of crude oil. The commission has never made an order under § 2. The court found that none of the proration orders here involved were made for the purpose of fixing prices. The fact that the commission never limited production below market demand, and the great and long continued downward trend of prices contemporaneously with the enforcement of proration, strongly support the finding that the orders assailed have not had that effect. And if § 2 were to be held unconstitutional the provisions on which the orders rest would remain in force. The unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions. Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law. *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, 565. *Pollock* v. *Farmers' Loan &*

*Trust Co.,* 158 U. S. 601, 635. *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362, 395–396. *Field* v. *Clark,* 143 U. S. 649, 695–696. Section 10 declares that the invalidity of any part of the Act shall not in any manner affect the remaining portions. That discloses an intention to make the Act divisible and creates a presumption that, eliminating invalid parts, the legislature would have been satisfied with what remained and that the scheme of regulation derivable from the other provisions would have been enacted without regard to § 2. *Williams* v. *Standard Oil Co.,* 278 U. S. 235, 242. *Crowell* v. *Benson,* 285 U. S. 22, 63. *Utah Power & Light Co.* v. *Pfost, ante,* p. 165. The orders involved here were made under other sections which provide a complete scheme for carrying into effect, through action of the commission, the general rules laid down in §§ 3 and 4 for the prevention of waste. See *Julian Oil & Royalties Co.* v. *Capshaw,* 145 Okla. 237, 243; 292 Pac. 841. The validity of § 2 need not be considered.

2. Plaintiff contends that the Act and proration orders operate to burden interstate commerce in crude oil and its products in violation of the commerce clause. It is clear that the regulations prescribed and authorized by the Act and the proration established by the commission apply only to production and not to sales or transportation of crude oil or its products. Such production is essentially a mining operation and therefore is not a part of interstate commerce even though the product obtained is intended to be and in fact is immediately shipped in such commerce. *Oliver Iron Co.* v. *Lord,* 262 U. S. 172, 178. *Hope Gas Co.* v. *Hall,* 274 U. S. 284, 288. *Foster Packing Co.* v. *Haydel,* 278 U. S. 1, 10. *Utah Power & Light Co.* v. *Pfost, supra.* No violation of the commerce clause is shown.

3. Plaintiff assails the proration orders as unauthorized, lacking basis in fact and arbitrary. But it failed to show that the orders were not based upon just and rea-

sonable determinations of the governing facts: namely, that proportion of all crude oil, which may be produced from a common source without waste, that the production of plaintiff's wells bears to the total production from such source. Gauges were taken to determine the potential production of each well under rules and regulations prescribed by the commission and not shown to be inappropriate or liable to produce arbitrary or discriminatory results. It does not appear that the agents—umpires and committees—employed by the commission with the consent of the governor to enforce the provisions of the Act, did more than to make investigations necessary to secure for the commission data required to make the proration directed by § 4 or that they acted otherwise than as faithful subordinates. Plaintiff has not shown that any act or omission of these agents subjected it to any disadvantage or that the prorations were arbitrary or discriminatory in any respect. Obviously the commission, without agents and employees, could not make or enforce proration as directed by the Act. The plaintiff is not entitled to have the commission's orders set at naught and the purposes of the Act thwarted merely because, in the absence of legislative appropriations therefor, the salaries and expenses of agents or employees were paid out of funds raised by operators interested in having proration established under the statutory rule.

Proration, required to prevent waste defined in § 3 and to give effect to the rule prescribed by § 4, changes according to conditions existing from time to time, and percentages valid at one time may be inapplicable, unjust and arbitrary at another. *Bluefield Co.* v. *Public Service Comm.*, 262 U. S. 679, 693. *Knoxville* v. *Water Co.*, 212 U. S. 1, 19. As plaintiff has failed to prove that any order in force at the time of the trial was not in accordance with the rule prescribed by § 4 or otherwise invalid, the part of the decree from which it appealed will be affirmed. But

such affirmance will not prevent it in an appropriate suit, a different state of facts being shown to exist, from having an injunction to restrain the enforcement of any order proved to be not authorized by the Act or unjust and arbitrary and to operate to plaintiff's prejudice. Cf. *Euclid* v. *Ambler Co.,* 272 U. S. 365, 395.

## No. 486.

This is defendants' appeal from that part of the final decree that declares that §§ 8 and 9 are not valid and enjoins the attorney general and county attorney from enforcing them. In its conclusions of law the court below declares that these sections in terms impose penalties for violation of the Act, and not for violation of the orders of the commission; that §§ 1, 3, 4, 5 and 6 are too indefinite and uncertain to warrant the imposition of the prescribed penalties and that therefore both sections are invalid. The opinion points out that the Act is a penal statute and also a regulatory measure to be supplemented by rules, regulations and orders of the commission. It suggests that an operator or producer of oil from a common pool should not be required at the peril of severe penalties to determine whether in the operation of his oil well he is committing " economic waste " or producing in excess of the " reasonable market demands " because these terms are not defined in the Act and are of uncertain and doubtful meaning.

1. Defendants insist that no question concerning the validity of § 8 was before the court.

We do not find any direct or definite allegation in the record that defendants have threatened or are about to cause plaintiff to be prosecuted under § 8. The court found that no prosecution had been commenced against plaintiff, its officers or employees under that section. There is no finding, or evidence sufficient to require one, that any such prosecution was imminent or contemplated.

And the opinion states in substance that § 9 was the only provision of the Act as a penal statute that was before the court.

Equity jurisdiction will be exercised to enjoin the threatened enforcement of a state law which contravenes the Federal Constitution whenever it is essential in order effectually to protect property rights and the rights of persons against injuries otherwise irremediable; and in such a case a person, who as an officer of the State is clothed with the duty of enforcing its laws and who threatens and is about to commence proceedings, either civil or criminal, to enforce such a law against parties affected, may be enjoined from such action by a federal court of equity. *Terrace* v. *Thompson*, 263 U. S. 197, 214, and cases cited. The burden was upon plaintiff seeking to invoke that rule definitely to show that in order to protect its property rights it was necessary to restrain defendants from enforcing § 8. Indeed, the record before us indicates that plaintiff did not show that its rights were directly affected by any danger of prosecution under § 8 and therefore had no standing to invoke equity jurisdiction against its enforcement. *Oliver Iron Co.* v. *Lord, supra,* 180–181. *Massachusetts* v. *Mellon,* 262 U. S. 447, 488. *Aetna Insurance Co.* v. *Hyde,* 275 U. S. 440, 446 *et seq.* Undoubtedly § 8, if invalid, may be severed from other parts of the Act without affecting the provisions under which the prorations were made. *Ohio Tax Cases,* 232 U. S. 576, 594. It follows that the lower court erred in passing upon the validity of that section, and the decree will be modified to declare that no question as to § 8 was before the court.

2. Defendants also maintain that no question as to the validity of § 9 was before the court.

The record shows that plaintiff having taken crude oil in excess of the quantities allowed by the orders, the at-

torney general, May 28, 1931, brought suit under § 9 in a state court to have a receiver appointed for its wells. And he procured that court to issue a temporary injunction restraining plaintiff from producing oil or violating the Act or proration orders pending the appointment of a receiver. On the next day plaintiff filed an amended and supplemental bill applying for a stay of enforcement of the proration orders pending the determination of the appeal, No. 122, to this court.

June 13 the lower court, upon plaintiff's application and affidavits submitted by the parties, found that plaintiff would suffer irreparable loss and injury unless the stay be granted. And it entered an order: restraining the commission from instituting proceedings under § 6 of the Act; restraining the attorney general and county attorney from prosecuting under § 9 receivership proceedings against plaintiff; allowing plaintiff, on conditions which need not be stated here, to produce up to 10,000 barrels daily, and requiring the attorney general immediately to have the state court injunction dissolved.

It is clear, if § 9 is invalid, that the enforcement of its provisions pending the trial of this case would, as plaintiff claimed and the lower court found, have inflicted irreparable loss and damage upon the plaintiff. Defendants do not show or claim that the evidence does not establish that finding. The lower court had authority to stay the enforcement of the assailed orders pending the determination of plaintiff's appeal from the denial of its motion for temporary injunction. *Hovey* v. *McDonald,* 109 U. S. 150, 161. *Cotting* v. *Kansas City Stock-Yards Co.,* 82 Fed. 839, 857. *Cumberland Tel. Co.* v. *Pub. Serv. Comm.,* 260 U. S. 212. *Virginian Ry. Co.* v. *United States,* 272 U. S. 658, 669 *et seq.* The jurisdiction of the court was properly invoked to determine whether plaintiff was entitled to protection against the shutting down

and seizure of its wells and the sale of its oil pending the federal court's final decision.

The attorney general, though not required so to do, dismissed the suit in the state court, and here insists that, as no proceeding for a receiver was pending, the court erred in construing or passing on the validity of § 9. But, when regard is had to the facts and circumstances, it is clear that such dismissal did not require the court to hold that thereby the purpose of the attorney general and county attorney had changed or that prosecution under that section was no longer imminent. The court was therefore properly called upon to pass upon its validity.

3. Section 9 provides: " That in addition to any penalty imposed under the preceding section, any person, firm or corporation, violating the provisions of this act, shall be subject to have his or its producing property placed in the hands of a receiver by a court of competent jurisdiction, at the suit of the State through the Attorney General, or any county attorney, but such receivership shall only extend to the operating of producing wells and the marketing of the production thereof, under the provisions of this act." The language used applies to violations of the Act and does not extend to violations of orders of the commission. It is plain and leaves no room for construction. A direct and unambiguous expression would be required to warrant an inference that the state legislature intended to authorize the seizure of producers' wells and the sale of their oil for a mere violation of an order.

The context and language used unmistakably show that the section imposes a penalty and is not a measure in the nature of, or in aid of remedy by, injunction to prevent future violations. By § 6 the commission—which in respect of such matters is a court of record (state constitution, Art. IX, § 19)—is empowered to punish as for contempt violation of the commission's orders by fines up to $500 per day during continuance of such violation.

§§ 3498, 3499, C. O. S. 1921. *Planters' Cotton & Ginning Co.* v. *West Bros.*, 82 Okla. 145, 147; 198 Pac. 855. And § 8 declares that, " in addition to any penalty " that may be imposed by the commission for contempt, one directly or indirectly " violating the provisions of this act " shall be guilty of a misdemeanor and be punished by fine or imprisonment. And similarly the liability under § 9 is for " violating the provisions of this act " and is " in addition to any penalty " imposed by § 8. Both deal with an act already committed. Moreover, liability under § 9 is not limited to seizure and operation of the offender's wells but extends to the marketing of his oil. Absolute liability arises from a single transgression, and prosecution therefor may be had after all occasion for restraint of production has ceased. There is nothing in the Act by which the duration of the receivership may be determined. An owner whose wells are so seized may not, as of right, have production reduced or withheld to await a better demand, or have any voice as to quantities to be produced, or continue to have his oil transported by means of his own pipelines or other facilities, or have it sent to his own refinery or delivered in fulfillment of his contracts. Plainly such a taking deprives the owner of property without compensation even if the moneys received for oil sold less expenses are accounted for by the receiver. The suit is prosecuted by the State to redress a public wrong denounced as crime. The provisions of § 9 are not consistent with any purpose other than to inflict punishment for violation of the Act and they must be deemed as intended to impose additional penalties upon offenders having oil producing wells. *Boyd* v. *United States*, 116 U. S. 616, 634. *United States* v. *Reisinger*, 128 U. S. 398, 402. *Huntington* v. *Attrill*, 146 U. S. 657, 667, 668.

As § 9 declares that one " violating the provisions of this act shall be subject " to the prescribed penalties, it is necessary to refer to the regulatory provisions here in-

volved. Section 1 prohibits "production of crude oil . . . in such manner and under such conditions as to constitute waste." Section 3 declares that, "in addition to its ordinary meaning," "waste" shall include "economic waste, underground waste, surface waste, and waste incident to the production of crude oil or petroleum in excess of transportation or marketing facilities or reasonable market demands." Section 4 provides that whenever full production from any common source can only be obtained "under conditions constituting waste" then one having the right to produce from such source may take therefrom only such proportion "that may be produced therefrom, without waste, as the production of the well or wells" of such taker "bears to the total production from such common source of supply."

There is nothing to support defendants' suggestion that the regulatory provisions of the Act do not become operative until the commission has defined permissible production. As shown above, § 9 does not cover violations of orders of the commission. The validity of its provisions must be tested on the basis of the terms employed. In *Connally* v. *General Construction Co.*, 269 U. S. 385, 391, this court has laid down the rule that governs here: " That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."

The general expressions employed here are not known to the common law or shown to have any meaning in the

oil industry sufficiently definite to enable those familiar with the operation of oil wells to apply them with any reasonable degree of certainty. The meaning of the word "waste" necessarily depends upon many factors subject to frequent changes. No act or definite course of conduct is specified as controlling and, upon the trial of one charged with committing waste in violation of the Act, the court could not foresee or prescribe the scope of the inquiry that reasonably might have a bearing or be necessary in determining whether in fact there had been waste. It is no more definite than would be a mere command that wells shall not be operated in any way that is detrimental to the public interest in respect of the production of crude oil. And the ascertainment of the facts necessary for the application of the rule of proportionate production laid down in § 4 would require regular gauging of all producing wells in each field, a work far beyond anything that reasonably may be required of a producer in order to determine whether in the operation of his wells he is committing an offense against the Act.

In the light of our decisions, it appears upon a mere inspection that these general words and phrases are so vague and indefinite that any penalty prescribed for their violation constitutes a denial of due process of law. It is not the penalty itself that is invalid but the exaction of obedience to a rule or standard that is so vague and indefinite as to be really no rule or standard at all. *United States* v. *Cohen Grocery*, 255 U. S. 81, 89. *Small Co.* v. *Am. Sugar Rfg. Co.*, 267 U. S. 233, 239. *Connally* v. *General Construction Co.*, supra. *Cline* v. *Frink Dairy Co.*, 274 U. S. 445, 454. *Smith* v. *Cahoon*, 283 U. S. 553, 564.

*No. 122, dismissed.*
*No. 485, affirmed.*
*No. 486, modified and as modified affirmed.*