NORTHEAST BANCORP INC. and
Union Trust Company, Plaintiffs,

v.

Brian J. WOOLF, Banking Commission-
er of the State of Connecticut,
Defendant.

Civ. A. No. H–83–654 (TFGD).

United States District Court,
D. Connecticut.

Dec. 16, 1983.

George D. Reycraft, Gregory Mertz, Cadwalader, Wickersham & Taft, New York City, for plaintiffs.

Jonathon L. Ensign, John G. Haines, Asst. Attys. Gen. for the State of Conn., Hartford, Conn., for defendant.

## RULING ON MOTION TO DISMISS

DALY, Chief Judge.

The plaintiff Northeast Bancorp Inc. ("Northeast") is a Connecticut bank holding company and the plaintiff Union Trust Company is a Connecticut bank and wholly-owned subsidiary of Northeast. They have brought suit, pursuant to 28 U.S.C. § 2201, seeking a declaratory judgment that various provisions of a recent Connecticut statute[1] entitled "An Act Concerning Interstate Banking" are unconstitutional. In addition, the plaintiffs seek the issuance of a permanent injunction prohibiting the defendant, the Banking Commissioner of the State of Connecticut, from enforcing the alleged unconstitutional provisions of the statute. In response, the defendant has moved to have the plaintiffs' complaint dismissed, arguing that the plaintiffs lack standing to make their claims. After reviewing the briefs submitted and hearing oral argument, the Court has concluded that the plaintiffs have not made adequate allegations of standing in either their complaint or the affidavits which they filed in opposition to the defendant's motion to dismiss; although they have alleged that they will be injured by the new Connecticut law, the plaintiffs have not alleged a concrete injury which can fairly be traced to the

---

1. Public Act No. 411, enacted on June 8, 1983.

challenged statute and which is likely to be redressed by a favorable decision of the Court. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Accordingly, the defendant's motion must be granted and the plaintiffs' complaint dismissed. The Court's reasoning is set forth below.

*Factual Background*

The American banking industry is regulated on both the state and federal level. One of the major pieces of federal legislation is the Bank Holding Company Act of 1956 ("the BHC Act"), 12 U.S.C. § 1841 *et seq.* Section 3(d) of the BHC Act, commonly known as "the Douglas Amendment," prohibits the Federal Reserve Board from approving any application by a bank holding company to acquire an interest in a bank located in another state, unless the laws of that other state explicitly authorize acquisition of local banks by out-of-state holding companies. 12 U.S.C. § 1842(d). The Douglas Amendment, as the defendant points out in his brief, thus acts as a general bar to interstate banking under federal law,[2] but permits a state to enact specific legislation lifting this bar. Defendant's Memorandum in Support of Motion to Dismiss at 6.

In early June of 1983, the State of Connecticut took action to lift the bar of the Douglas Amendment when it enacted Public Act No. 83–411, entitled "An Act Concerning Interstate Banking" ("The Connecticut act" or "the act"). The new law does not completely open up the Connecticut borders to all out-of-state banking holding companies, but is instead designed to be a limited experiment in interstate banking involving only New England states. The act provides that a Connecticut banking institution may be acquired by an out-of-state banking institution only if two conditions are met: (1) the acquiring institution must conduct its principal operations and maintain its principal place of business in one of the other five New England states, and (2) that state must accord reciprocal acquisition privileges to banking institutions in Connecticut through legislation that is "no more restrictive than" the Connecticut act. Public Act No. 83–411, § 2; Plaintiffs' Memorandum in Opposition to Motion to Dismiss at 2. In addition, the act contains what one Connecticut senator has called an "anti-leapfrogging" provision. This provision states that if, following an acquisition of a Connecticut bank under the act, the resulting entity comes to be controlled by a non-New England banking institution, the Banking Commissioner of Connecticut must immediately order that institution to divest itself of the subsidiary Connecticut bank which was acquired earlier. *Id.*

Massachusetts and Rhode Island have passed laws which are similar to the Connecticut act and only allow interstate transactions with banks in other New England states with reciprocal legislation. Act of Dec. 20, 1982, 1983 Mass.Adv.Legis.Serv. ch. 626 (Law.Coop.); 1983 R.I.Pub.Laws Ch. 201. The Massachusetts act took effect on July 1, 1983 and the Rhode Island act will take effect on July 1, 1984. Maine has also enacted an interstate banking statute. Me.Rev.Stat.Ann.Tit. 9–B § 1013(2) (1975, effective January 1, 1978) (amended 1983). Unlike the other New England statutes, the Maine act does not have any geographic restrictions, but allows interstate transactions with any banks located in a state with reciprocal legislation. According to the plaintiffs, the less discriminatory nature of the Maine act caused Connecticut to write the "anti-leapfrogging" provisions into its law in order to prevent two-step transactions by a non-New England bank. Complaint at ¶ 13.

Since the Connecticut act went into effect in June, three Connecticut banks have entered into agreements with Massachusetts banks. CBT Corporation, Connecti-

---

**2.** The only exception under federal law to the Douglas Amendment is contained in the Garn-St. Germain Depository Institutions Act of 1982,

12 U.S.C. §§ 1823(f)(1) and 1730a(m)(1)(A)(i). These provisions allow emergency acquisitions across state lines of failing institutions.

cut's largest bank holding company, has agreed to merge with the Bank of New England Corporation, the third largest bank holding company in Massachusetts. Hartford National Corporation, a Connecticut bank holding company which owns the Connecticut National Bank, has entered into an agreement to acquire Arltru Bancorporation, a $783 million banking institution based in Lawrence, Massachusetts. Most recently, the First National Boston Corporation, the largest bank holding company in New England, agreed to acquire Colonial Bancorp, a Connecticut bank holding company with assets of $1.3 billion. These three agreements are currently pending before the defendant Banking Commissioner and the Federal Reserve Board.

Unlike the above Connecticut banks, the plaintiffs have not entered into any agreements with a Massachusetts bank. Instead, on August 3, 1983, two months after the passage of the Connecticut statute, the plaintiffs announced that they had agreed to merge with the Bank of New York Co., Inc., a New York banking institution. Such a merger is clearly barred under the Douglas Amendment and the Connecticut act, and is only viable if enabling legislation is passed by the State of Connecticut or the Federal government or if a court strikes down and excises the geographic restrictions in the existing Connecticut law.

On July 29, four days before they announced their merger agreement with the Bank of New York, the plaintiffs instituted this action. In their complaint, they allege that the geographic restrictions of the Connecticut act violate the supremacy, commerce, compact, due process and equal protection clauses of the United States Constitution and the due process and equal protection clauses of the Connecticut Constitution. They seek a declaratory judgment to this effect and an injunction prohibiting the defendant from enforcing the enabling sections of the act. The defendant responded with the motion to dismiss for lack of standing now before the Court.

*Discussion*

■ Article III of the Constitution provides that the "judicial power" of the United States shall only extend to the resolution of "cases" and "controversies." An incident of the Article III limitation on the judicial power of federal courts is the requirement that "a litigant have 'standing' to challenge the action sought to be adjudicated in the lawsuit." *Valley Forge College, supra,* 454 U.S. at 471, 102 S.Ct. at 757. In determining whether a party has "standing," federal courts must uphold certain basic constitutional requirements and take into account various prudential considerations. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975).

■ The constitutional requirements for standing have not always been clear, but the Supreme Court has recently attempted to resolve any ambiguity by writing: "at an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge College, supra,* 454 U.S. at 472, 102 S.Ct. at 758 (citations omitted).

■ If a plaintiff satisfies the above constitutional requirements, the Court should then be guided by the following prudential considerations. First, "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin, supra,* 422 U.S. at 499, 95 S.Ct. at 2205. Second, courts should refrain from deciding "abstract questions of wide public significance" which merely amount to " 'generalized grievances' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge College, supra,* 454 U.S. at 475, 102 S.Ct. at 760, *quoting Warth v. Seldin, supra,* 422 U.S. at 499–500, 95 S.Ct. at 2205. Third,

and finally, the Supreme Court has required that the plaintiff's complaint fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

 When ruling on a motion to dismiss for lack of standing, the trial court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. at 2206. However, as one Justice has recently written, "[t]he Art. III requirement of a genuine case or controversy should not be deprived of all substance by meaningless pleading." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 1126, 71 L.Ed.2d 214 (1982) (Powell, J., concurring). Furthermore, when the plaintiff is seeking a declaratory judgment that a state statute is unconstitutional, the requirements for standing should be strict. *See Griswold v. Connecticut,* 381 U.S. 479, 481, 85 S.Ct. 1678, 1679, 14 L.Ed.2d 510 (1965).

The plaintiffs contend that the following injuries flow from the new Connecticut law:

(1) The plaintiffs and others similarly situated are denied the right to acquire or merge with non-New England banking institutions, regardless of whether the states in which the non-New England banking institutions are located have reciprocal legislation permitting interstate transactions. Reycraft Affidavit[3] at ¶ 5(a); Complaint at ¶ 20.

(2) The plaintiffs and others similarly situated are effectively denied, by the "anti-leapfrogging" provisions of the Connecticut act, the right to consummate a two-step merger transaction (i.e. first be acquired by an institution in a New England state and then have the resulting entity acquired by a non-New England banking organization). Reycraft Affidavit at ¶ 5(b); Complaint at ¶ 22.

(3) The Connecticut act, by precluding non-New England banking institutions from acquiring Connecticut banking institutions, deprives the plaintiffs' shareholders of the opportunity to realize the full value of their investment. Reycraft Affidavit at ¶ 6; Complaint at ¶ 21.

(4) The plaintiffs and others similarly situated will be required to compete, at a disadvantage, with Connecticut banking institutions that are presently proceeding, allegedly under the authority of the Connecticut act, with acquisitions involving banking entities in other New England states—but for the Connecticut statute, such acquisitions could not proceed and, consequently, the plaintiffs would not confront these larger amalgamations, which are likely to enjoy a competitive edge. Reycraft Affidavit at ¶ 5(c).

The defendant argues that the first two alleged injuries are inadequate to confer standing because they are not injuries which are "likely to be redressed by a favorable decision" of the Court. *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). Specifically, the defendant points out that, even if this Court declares the enabling sections of the Connecticut act unconstitutional as the plaintiffs seek, *see* Complaint at ¶¶ A–F, the plaintiffs will still be barred by the Douglas Amendment from merging with a non-New England bank. Memorandum in Support of Motion to Dismiss at 20–23. The plaintiffs respond that the defendant's argument is flawed to the extent that it attempts to predict the relief the Court will order if it finds for the plaintiffs: "[i]f this Court chooses to strike down only the discriminatory features of the Interstate Act, plaintiffs' merger with a New York institution *may* proceed; if, on the other hand, the Court elects to declare unlawful only the 'anti-leapfrogging' provisions of the statute, plaintiffs may participate in a two-step transaction." Memorandum in Oppo-

---

**3.** Affidavit of George D. Reycraft, attorney for the plaintiffs, dated October 4, 1983.

sition to Motion to Dismiss at 19 (emphasis original).

■ The Court agrees with the defendant that a decision in favor of the plaintiffs will not redress their first two alleged injuries. If the Court determines that either the geographic restrictions as a whole or the "anti-leapfrogging" provisions alone are unconstitutional, the only remedy available to the Court will be to declare the enabling sections of the statute unconstitutional and enjoin the defendant from enforcing them. Indeed, this is the relief the plaintiffs pray for in their complaint. The radical relief now suggested by the plaintiffs in their brief, whereby the Court would excise all the geographic restrictions or just the "anti-leapfrogging" provisions and effectively open up the Connecticut borders to full-blown interstate banking, would obviously go beyond the intent of the Connecticut legislature and represent an improper act of judicial legislation. Such a course of action is simply unavailable to this Court as a matter of law.

■ As the defendant accurately states in his reply brief, a Court may excise invalid provisions in a statute without affecting the remainder *only if* the valid part is fully operative and there is a showing that the legislature would have enacted the valid provisions independently. Defendant's Reply Memorandum at 3, *citing United States v. Jackson*, 390 U.S. 570, 585, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968); *Champlin Refining Co. v. Corporation Commission*, 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1931). Furthermore, when the questioned provisions or clauses restrict "a power granted by the legislature, the case against severance is strong. Otherwise, the scope of the power would be enlarged beyond the legislature's intent." *McCorkle v. United States*, 559 F.2d 1258, 1261 (4th Cir.1977), *cert. denied*, 434 U.S. 1011, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978).

The impropriety of severance in this case is clear both from the plain language of the statute and its legislative history. First, the geographic restrictions are so intertwined with the enabling sections of the act that it is doubtful a court could excise those restrictions and still find the remaining language to be fully operative. Second, under the doctrine of *expressio unius est exclusio alterius*, the fact that only the term "New England bank holding company" is used throughout the statute's permissive language raises a presumption that the legislature intended to exclude non-New England banks and avoid opening up Connecticut to full interstate banking. *See, e.g., Botany Worsted Mills v. United States*, 278 U.S. 282, 289, 49 S.Ct. 129, 131, 73 L.Ed. 379 (1929); *New York Central Railroad Company v. United States*, 267 F.Supp. 619, 627 (S.D.N.Y.1967). Finally, such an intent on the part of the Connecticut legislature is expressly confirmed, not only by the existence of the "anti-leapfrogging" provisions, but also by the fact that both houses rejected amendments to the statute which would have eliminated the geographic restrictions after two years. 1983 General Assembly, Senate Proceedings, pp. 59–99 (May 18, 1983); 1983 General Assembly, House Proceedings, pp. 215–99 (May 26, 1983).

The plaintiffs themselves concede, in ¶ 22 of their complaint, that the legislature did not intend to expose Connecticut banking institutions to full-scale interstate banking: "[t]he Act ... is intended to shelter banking institutions in Connecticut ... from competition by banking institutions whose principal place of business is outside of New England." [4] For the plaintiffs now to suggest, in opposition to the defendant's motion to dismiss, that this Court could order relief which would open up the Connecticut borders to full interstate banking is either contradictory or represents a novel theory of the judicial role in a system of separated powers. Indeed, the plaintiffs cite no authority in support of their proposition that this Court could surgically excise the challenged provisions in the Connecticut act.

---

**4.** *See also* ¶¶ 9, 10 & 13 of the complaint.

In sum, the geographic restrictions and the "anti-leapfrogging" provisions are not mere appendages to the act but "its very core." Defendant's Reply Memorandum at 5. Even if those restrictions are unconstitutional, as the plaintiffs allege, severance of them is not a remedy which is available to the Court as a matter of law; based on the plain language of the act and its legislative history, ordering severance in the manner the plaintiffs suggest would do violence to the statute and the intent of the legislature behind it. The most favorable decision this Court could lawfully render for the plaintiffs would be to declare the enabling sections of the act unconstitutional and enjoin the defendant from enforcing them. Such relief, however, would not redress the first two injuries alleged by the plaintiffs; the plaintiffs would still be prevented by the Douglas Amendment from merging either directly or indirectly with a non-New England bank. To allow the complaint to go forward on the basis of the first two alleged injuries, therefore, would be to sanction the entrance of a gratuitous and advisory opinion in violation of Art. III and the cases interpreting it. Accordingly, the plaintiffs do not have standing on the basis of the first two injuries they have alleged.

The plaintiffs' third alleged injury—that the geographic restrictions deprive their shareholders of the opportunity to realize the full value of their investment—is similarly inadequate for the purposes of standing. The plaintiffs claim that the geographic restrictions "necessarily limit the universe of potential parties to acquisitions, and thereby artificially depress the value of a shareholder's stock." Reycraft Affidavit at ¶ 6. If the plaintiffs were not precluded by the Connecticut act from executing their merger agreement with the Bank of New York, the plaintiffs assert that their shareholders "would receive consideration for their shares equivalent to 1.85 times book value. In contrast, Bank of New England Corporation is paying approximately book value for the shares of CBT Corporation." *Id.*

Assuming only for the purposes of deciding this motion that a corporation can have standing to assert the rights of its shareholders, the Supreme Court has recognized that such "third party" standing can only exist if the persons whose rights are being vicariously asserted" ... would otherwise have standing to sue in their own right." *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The plaintiffs' shareholders, however, would not have standing if they were suing in their own right. The alleged injury to them is derivative of the first two alleged injuries; it is grounded in the inability of the plaintiffs to merge with a non-New England bank. For reasons already explained, the Court cannot expand the scope of the statute and redress such an injury. Consequently, since the alleged shareholder injury is inadequate to confer standing on the shareholders themselves, it cannot suffice to give the plaintiffs "third party" or "representative" standing.

The fourth and final injury alleged by the plaintiffs is that they will be required to compete, at a disadvantage, with Connecticut banks that are proceeding with mergers and acquisitions under the authority of the new law. The plaintiffs claim that, but for the Connecticut act, these mergers and acquisitions could not proceed and the plaintiffs "would not confront these larger amalgamations, which are likely to enjoy a competitive edge." Reycraft Affidavit at ¶ 5(c). This alleged injury is not articulated in the plaintiffs' complaint, but appears in an affidavit from plaintiffs' counsel submitted in opposition to the motion to dismiss. *Id.* The defendant contends that he should not be expected to respond to an allegation not contained in the complaint. Defendant's Reply Memorandum at 6–7. For the purposes of ruling on the instant motion to dismiss, however, the Court may consider the affidavit and any allegations of fact set forth in it which are possibly supportive of plaintiffs' standing. *Warth, supra,* 422 U.S. at 501–502, 95 S.Ct. at 2206–2207. Nonetheless, the

timing of the plaintiffs' allegation regarding competitive disadvantage is not completely irrelevant. The fact that a particular injury is not articulated with other injuries in the original complaint, but is alleged as an additional injury only after the filing of a motion to dismiss, implies to this Court that the injury may not, in fact, be so "actual" and "imminent" as is necessary to justify the exercise of this Court's ultimate power, the adjudication of the constitutionality of a state statute. Yet, this consideration is not the major deficiency in the fourth injury alleged by the plaintiffs.

 Even if the plaintiffs are actually and imminently threatened with being placed at competitive disadvantage vis a vis the Connecticut banks that will grow through mergers with Massachusetts banks, such an injury cannot fairly be traced to the challenged statute or the actions of the defendant. The Supreme Court has stated:

> "Although the law of standing has been greatly changed in [recent] years, we have steadfastly adhered to the requirement that ... federal plaintiffs must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction." *Linda R.S. v. Richard D.,* 410 U.S. [614] at 617 [93 S.Ct. 1146 at 1148, 35 L.Ed.2d 536]. In other words, the 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.

*Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–1926, 48 L.Ed.2d 450 (1976).

The Court does not read the Connecticut statute as placing any Connecticut bank, including the plaintiffs, at a competitive disadvantage. The language of the statute is impartial on its face in terms of its treatment of Connecticut banks. While the statutory provisions discriminate between New England and non-New England banks, they do not discriminate amongst Connecticut banks.

The plaintiffs might very well have standing if they could allege, and show, harm to their competitive position flowing *directly* from the Connecticut act. *See Marshall & Ilsley Corp. v. Heiman,* 652 F.2d 685, 692 (7th Cir.1981); *cert. denied,* 455 U.S. 981, 102 S.Ct. 1489, 71 L.Ed.2d 691 (1982); *Sierra Club v. Morton,* 405 U.S. 727, 733–734, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972). However, the plaintiffs have not made such an allegation. They have not alleged that there is anything peculiar about the configuration of the Connecticut banking industry which causes the seemingly impartial statute to have a disparate effect on the plaintiffs. At oral argument, the Court squarely put this issue to plaintiffs' counsel. The Court asked how the plaintiffs were at a disadvantage and why they could not move into the Massachusetts market like other Connecticut banks were doing. Counsel replied: "I would submit, and this is a matter of proof, there aren't that [large a] number of New England banks of that size left after the three mergers that are now before the Commissioner. There would be no Maine banks of comparable size to the two largest Massachusetts banks." [5] Counsel did not claim that the plaintiffs were, or are now, incapable of consummating a merger or acquisition under the new Connecticut law,[6] but simply that there may

---

**5.** Statement of George D. Reycraft, attorney for the plaintiffs, at oral argument on October 12, 1983, as transcribed by the official court reporter.

**6.** Indeed, there already is some indication in the record that the plaintiffs are fully capable of competing equally under the new rules. For example, counsel asserts in his affidavit that, if the "anti-leapfrogging" provisions did not exist,

the plaintiffs would be "actively pursuing" a merger with a New England bank. Reycraft Affidavit at ¶ 5(b).

If the plaintiffs must merge with a New England bank in order to compete with the "new amalgamations," the Court does not see how this amounts to injury, especially since the plaintiffs claim they would be taking such a step

not be many large New England banks left to merge with or acquire. Such an injury, if indeed it is one,[7] is not traceable to the statute, but to the plaintiffs themselves. Any competitive disadvantage which the plaintiffs are now at vis a vis the "new amalgamations" is the result of either inaction on the plaintiffs' part when the statute came into effect or a conscious decision by them at that time to forgo immediate opportunities in New England for possible future opportunities with the Bank of New York. Quite simply, the plaintiffs' allegation of competitive disadvantage, cast in its present form and on the present record, is unpersuasive for the purposes of standing and cannot be the basis for invoking the serious power which the plaintiffs seek.

▆ Before closing one other argument must be addressed. In one of the plaintiffs' affidavits, it is written: "[i]f, as the Commissioner now contends, Northeast and Union Trust lack standing to challenge this statute, it is fair to wonder precisely what parties would possess standing." Reycraft Affidavit at ¶ 19. The Court is not at this point convinced that there are no other parties which might possess standing to challenge the Connecticut act. However, even if there were no other potential plaintiffs, that fact alone does not justify conferring standing on the existing plaintiffs. *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 227, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974). "This view would convert standing into a requirement that must be observed only when satisfied." *Valley Forge College, supra,* 454 U.S. at 489, 102 S.Ct. at 767. Furthermore, the lack of any proper parties to litigate a claim implies that the subject matter of the claim is committed to the purview of the legislature and the political process. *United States v. Richardson,* 418 U.S. 166, 179, 94 S.Ct. 2940, 2947, 41 L.Ed.2d 678 (1974).

The Court does not doubt that the existing plaintiffs have enough interest in the subject matter of their claim "to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Once again, however, this is not the test for standing and cannot be a substitute for the constitutional requirements discussed earlier. As the Supreme Court recently stated, "standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *Valley Forge·College, supra,* 454 U.S. at 486, 102 S.Ct. at 765.

Even if the Connecticut act is unconstitutional as the plaintiffs claim, "the Art. III requirements of standing are not satisfied by 'the abstract injury in nonobservance of the Constitution ...'" *Id.* at 482, 102 S.Ct. at 764, *quoting Schlesinger v. Reservists Committee to Stop the War, supra,* 418 U.S. at 223, n. 13, 94 S.Ct. at 2933, n. 13. On the present record, the Court cannot help but be guided by what the Supreme Court said in the context of an 1892 case:

> The theory upon which, apparently, this suit was brought is that parties have an appeal from the legislature to the courts, and that the latter are given an immediate and general supervision of the constitutionality of the acts of the former. Such is not true. Whenever, in pursuance of an honest and actual antagonistic assertion of rights by one individual against another, there is presented a question involving the validity of any act of any legislature, state or federal, and the decision necessarily rests on the competency of the legislature to so enact, the court must, in the exercise of its solemn duties, determine whether the act be constitutional or not; but such an inquiry is the ultimate and supreme function of the courts. It is legitimate only in the last

---

on their own initiative if the "anti-leapfrogging" provisions did not exist.

7. The Court agrees with counsel that it is not clear from the present record, and would have

to be a matter of proof, whether there are no large New England banks left for the plaintiffs to merge with or acquire.

resort, and as a necessity in the determination of real, earnest, and vital controversy between individuals.

*Chicago & G.T. Ry. Co. v. Wellman,* 143 U.S. 339, 345, 12 S.Ct. 400, 402, 36 L.Ed. 176 (1892). By quoting the above language, this Court does not mean to intimate that it has concluded the Connecticut act is beyond judicial review. To allow the existing complaint to go forward on the present allegations, however, would undermine the longstanding constitutional principles articulated above and the specific rules of standing which have been derived from those principles over the years.

Accordingly, since the plaintiffs have not alleged a concrete injury fairly traceable to the challenged statute and redressable by a favorable decision of the Court, the defendant's motion to dismiss is granted. However, the complaint is dismissed without prejudice to refiling, if possible, by the same plaintiffs on adequate allegations of standing in accordance with the views set forth in this opinion. Of course, different plaintiffs are not directly affected by this decision.

It is SO ORDERED.