CANNING et al. v. BENNETT et al.

No. 34571.   April 29, 1952.

Rehearing Denied July 23, 1952.

*245 P. 2d 1149.*

Rainey & Barksdale, Okmulgee, for plaintiffs in error.

Steele & Boatman, Okmulgee, for defendants in error.

PER CURIAM. Clarence Clark Bennett, a resident of Okmulgee county, Oklahoma, died March 25, 1940, leaving a will dated December 10, 1938, and a codicil thereto dated March 9, 1940, which were admitted to probate by the county court of Okmulgee county on April 15, 1940. Administration proceedings were completed and final decree entered by said court April 27, 1942.

The will directed the payments of debts and funeral expenses; ten per cent of the remainder of the estate was placed in "The Blanche Emma Bennett Educational and Student Loan Fund" and is not involved herein; the remaining 90 per cent of the estate was devised as follows: to Willma Edna Bennett, surviving wife, 18% and a life estate in the homestead property and furnishings; 18% each to Harold Richard Bennett, Nola Frances Canning, and Merna Grace Thomas, children of deceased; and the remaining 18% of the estate to the four children of a deceased daughter, hereinafter referred to as the Litman heirs. The will, among other things, provided:

"5. If my beloved wife or anyone or more of my children now living should die before the final settlement of my estate, without leaving heirs of their body, the share to which he or she would be entitled and which has not been paid or delivered to them, shall become and remain a part of my estate and be distributed herein as a part of said estate to those mentioned and provided for herein.

"12. If and in the event any of the persons named in this my last will and testament, save and except my wife, shall bring or start a suit or other proceedings to set aside or interfere in any way with the terms and conditions of my last will and testament, then I do hereby give, bequeath and devise to said person or persons, the sum of One and no/100 Dollars ($1.00) and no more. The portion or part that they would otherwise receive from my estate, shall be divided among those others herein named according to the percentages mentioned unless said suit or other proceedings is to defend and sustain the terms of this my last will and testament."

The codicil placed all property of every kind, including the Blanche Emma Bennett Educational and Student Loan Fund, in a trust, named the Central National Bank of Okmulgee, Oklahoma, Willma Edna Bennett and Harold Richard Bennett the trustees of said trust, provided for certain payments to be made to the surviving wife, and a salary to Harold Richard Bennett as superintendent of the properties and for the maintenance of a trust office. The codicil contained the following provisions which seem pertinent to this controversy:

"4 (c) I hereby direct my trustees, or a majority of them, if in their judgment the net profits from said trust estate will warrant the same, to expend from said net profits at the end of each three months, and to pay to my beloved wife, my children and grandchildren mentioned in my said last will and testament, if living, or in case of their death, then those entitled to their share as set forth in my last will and testament, such sums as they, my trustees, or a majority of them, may agree upon, said amounts so paid to each one to be made according to the percentages as set forth in my last will and testament, and after said trustees have set aside ten per cent of the net profits for and to be used for 'The Blanche Emma Bennett Educational and Student Loan Fund'. Any and all moneys so paid under and by virtue of this paragraph (c) shall be and is hereby declared to be an indebtedness or an advancement against their share or portion of my estate to which they are or may be entitled under the terms

and conditions of my last will and testament.

"(d) I direct that in the event my beloved wife, Willma Edna Bennett, and my son, Harold Richard Bennett, acting as trustees, should be of the opinion that it would be for the best interest of said trust estate and all parties mentioned or referred to in my last will and testament, to terminate and close said trust estates prior to or before the end of the ten-year period for which this estate in trust is created, then said trustees shall have the right to and are hereby directed to make final distribution of the same in accordance with the terms and conditions herein set forth and as set forth in my last will and testament.

"(e) At the termination of the period for which this trust estate is created, I do hereby direct and authorize my said trustees, or a majority of them, to sell the properties in their charge as such trustees, if in their judgment they deem it advisable and for the best interests of those persons named or referred to in my last will and testament, and to divide the proceeds therefrom and on hand in said trust estate in accordance with the terms and conditions set forth in my last will and testament.

"(h) I direct that my heirs or those mentioned and provided for in my last will and testament, shall not sell, transfer, mortgage or convey their interest in my estate, or the properties covered by this trust estate, or any part thereof, unless said sale be made to one of the other heirs mentioned and set forth in my last will and testament, or to the trustees of this trust for the use and benefit of the other heirs.

"Sixth: If my beloved wife, or any one of my other heirs provided for under my last will and testament, should die between the closing of the administration and before the final termination or closing of this trust estate, then and in that event the share to which he or she would be entitled and which has not been paid to them, shall become and remain a part of my estate and trust estate and be distributed in accordance with the terms and conditions of my last will and testament.''

By the ninth numerical paragraph of the codicil, the terms and provisions of the original will were left intact except as specifically changed or modified by the provisions of the codicil.

On August 24, 1948, the Central National Bank of Okmulgee, Oklahoma, sole trustee by virtue of the refusal of the Bennetts to act as co-trustees, and under judgment of the district court of Okmulgee county, Oklahoma, filed its petition for authority to terminate the trust and for further judgment decreeing the persons entitled to participate in the distribution of the residue of the estate and the proportion thereof to which each such person would be entitled. It alleged that it believed the only persons entitled to participate in such distribution were Willma Edna Bennett and Harold Richard Bennett; that the defendants, Nola Frances Canning and Henry James Thomas, claimed some interest in and to the trust estate; that if their claims were correct, similar claims might also be made by the defendants, Phyllis Ann Litman, Rhea Frances Litman, Ruth Litman Coe and Betty Jo Litman Main, referred to as the Litman heirs. It prayed that each of the defendants be required to set up what interest they had or claimed in said trust estate or be forever barred. Each of the defendants was served either personally or by publication. The Litman heirs, with the exception of Phyllis Ann Litman, a minor, who appeared by her guardian ad litem, L. L. Cowley, and certain other defendants, failed to enter appearance and were adjudged in default.

The contest developed between Willma Edna Bennett, surviving wife of Clarence Clark Bennett, and Harold Richard Bennett, his son, on one hand, and Nola Frances Canning, a daughter, and Henry James Thomas, surviving husband of Merna Grace Thomas, a deceased daughter and beneficiary, on the other.

The pleadings are too voluminous to set forth in this opinion. Suffice it to say that the Bennetts pleaded that they

and the trustee had, under the terms of the will, purchased all of the interests of the other beneficiaries except one-half of the interest of Merna Grace Thomas; that when she died May 2, 1948, that remaining interest passed to the Bennetts under the terms of the will and codicil. They joined with plaintiff in praying for termination of the trust and further prayed that the estate be distributed as follows: four-sevenths thereof to Harold Richard Bennett, subject to the life estate of Willma Edna Bennett in the homestead property and the furnishings therein; and the remaining three-sevenths of the trust estate, together with a life estate in the homestead and furnishings, to Willma Edna Bennett.

On the other hand, Canning and Thomas, in their answers and amended answers, alleged that the trust provisions of the will and codicil were void; that upon the death of Clarence Clark Bennett, the title to his properties passed immediately and absolutely to the persons named in the will and codicil as devisees and beneficiaries, and in the proportions therein specified; that the possession of said properties by said plaintiff bank was wrongful; that the bank held said properties, not as a trustee under the will, but under a "constructive trust" created when the bank wrongfully took possession thereof. The defendant Thomas further pleaded that when his wife, Merna Grace Thomas, died on May 2, 1948, she owned one-half of the interest devised to her under the will and also one-half of an interest which he alleged that she and her brother, Harold Richard Bennett, had purchased jointly; that his said wife died intestate and without issue; that no administration of her estate had been instituted; that her said interest passed to her heirs at law—one-half thereof to him as surviving husband, one-fourth thereof to her brother, Harold Richard Bennett, and one-fourth to her sister, Nola Frances Canning. Controverting said claims, the Bennetts alleged that Harold Richard Bennett, on April 20, 1942, purchased from his

sister, Nola Frances Canning, one-half of her beneficial interest in the trust estate, and on the same day entered into a written contract with his sister, Merna Grace Thomas, whereby Mrs. Thomas agreed to pay one-half of the purchase price of the interest so purchased, and certain items of expense connected with the purchase, in return for which Bennett agreed that Mrs. Thomas should become the owner of one-half of the interest purchased from the defendant Mrs. Canning; that Mrs. Thomas failed to pay her one-half of the purchase price; that thereafter, on April 5, 1948, Mrs. Thomas, joined by her husband, the defendant Henry James Thomas, for a valuable consideration, executed and delivered to Harold Richard Bennett, a complete release and satisfaction of said contract. The defendant Thomas alleged that said release and satisfaction was forgery and invalid and unauthentic; that long before said release was executed there was adequate funds from the earnings of said interest to pay off the obligation assumed by Mrs. Thomas. He also alleged that by specific understanding between his deceased wife and her brother, she was to share in the interests purchased by her brother from the Litman heirs, but this is denied by Harold Richard Bennett, the brother.

The defendant Nola Frances Canning makes no contest of the one-half of her interest purchased by her brother, Harold Richard Bennett, but she alleges that the assignment executed by her to the plaintiff trustees on December 6, 1946, for all the remaining interest then owned by her and that she might thereafter acquire, was invalid and illegal because of gross inadequacy of consideration therefor and because of the failure of the trustee and Harold Richard Bennett to disclose to her the value and worth of the interest; that if said assignment should be held valid for any purpose, although said assignment purported to convey to the trustee the interest she then owned and any that she might thereafter acquire, it

did not convey any interest other than what she then owned.

Both Canning and Thomas allege a conspiracy between the Bank and the defendants, the Bennetts, to deprive them of their rightful interests in the residue of said trust estate; this is denied by the plaintiff and the Bennetts. As to both defendants, Canning and Thomas, the Bennetts alleged that Merna Grace Thomas, during her lifetime, as well as said defendants, Canning and Thomas, each has admitted the validity of the will and codicil, acquiesced in the probate thereof and in the final distribution of the estate by the county court, and accepted the benefits of the trusteeship created by the will and codicil, and are therefore estopped from denying the validity of the will and codicil, of the final decree in the probate proceedings, and the trusteeship set up by the testator thereunder.

A jury was called at the request of the defendants, Canning and Thomas, and at the close of the evidence, after given certain instructions, the court submitted to the jury the one question of the authenticity and genuineness of the signatures of Merna Grace Thomas and Henry James Thomas by two interrogatories, to wit: "(1) Do you find that Henry James Thomas signed the release bearing date of April 5, 1948? (2) Do you find that Merna Grace Thomas signed the release bearing date of April 5, 1948?" To each of these interrogatories the verdict of the jury was "Yes". Certain other interrogatories were requested by the defendants Canning and Thomas, and refused by the trial court, to which said defendants excepted.

Later, and after briefs had been filed with the court, the trial court rendered judgment terminating the trust, adjudging that the defendants Willma Edna Bennett and Harold Richard Bennett were entitled to all the trust properties, and directing the trustee to distribute 4/7 thereof, subject to the life estate of Willma Edna Bennett, in the homestead and furnishings, to Harold Richard Bennett, and the remainder, together with said life estate, to Willma Edna Bennett, and further adjudging that neither Nola Frances Canning nor Henry James Thomas had any remaining interest in said trust estate. The defendants Canning and Thomas excepted to the judgment; later, their motions for new trial were overruled; thereafter, Canning and Thomas filed timely appeal in this court.

Numerous specifications of error are presented in the petition in error, but since only four propositions are briefed, these alone will be considered, and in the order presented in the briefs.

1. The first contention of appellants, Canning and Thomas, is that the trial court committed reversible error in giving to the jury instructions numbered 1, 4 and 5. It is apparent that, under former decisions of this court, the instructions 1, 4 and 5 placed too heavy a burden on Canning and Thomas in their efforts to establish that the signatures of Thomas and his wife, Merna Grace Thomas, were forgeries. Instruction No. 1 told the jury that it must be proved "to your satisfaction, by competent evidence, by a preponderance thereof" that the signatures of Thomas and his wife were forgeries. Instruction No. 4 informed the jury that "in order to prove a written instrument to be a forgery, the evidence must be clear, cogent and convincing, and such as produces a conviction to a moral certainty that the deed was false", and that if the evidence of the party alleging forgery does not establish "to a moral certainty" that the deed is a forgery, such evidence must be corroborated. Instruction No. 5 was along the same line as 1 and 4.

This court has heretofore held that such instructions are erroneous because they placed too heavy a burden upon the party called upon for the proof. Evidence that merely preponderates is sufficient.

If the court could see where Thomas and Canning have been injured and

their substantial rights prejudiced by the giving of these instructions, we should have no hesitancy in reversing the case because of these erroneous instructions. But under the evidence, and regardless of the instructions, we cannot see how an intelligent jury could have decided other than the signatures of the defendant Thomas and his wife, Merna Grace Thomas, to the release in question, were genuine. The evidence on this point was, in our judgment, conclusive. The defendant Thomas, in his answer, categorically denied that either he or his wife signed the release; but in his testimony, in answer to the question, "I will ask you if you ever affixed your signature to that instrument?" he replied "I don't remember". Nowhere in his testimony does he testify that the signature of his wife to the release was not her genuine signature. No witness testified that either of the signatures to the release was spurious. On the other hand, Harold Richard Bennett and Mr. Scott, a Kansas City handwriting expert whose qualifications as an expert were admitted, both testified positively to the genuineness of the signatures.

All of the surrounding circumstances lend support to that testimony. As a matter of fact, a comparison, even by an ordinary layman, of the facsimiles of these disputed signatures with facsimiles of admitted signatures, attached to the case-made, is convincing as to the correctness of the jury's answer to these interrogatories propounded by the court.

In the case of Midland Valley R. Co. v. Barnes, 162 Okla. 44, 18 P. 2d 1089, cited by Canning and Thomas, there was involved a similar instruction which this court held to be erroneous. However, in that case, the court said:

"It is the opinion of the majority of the court that while the instruction was erroneous and misleading, yet in the light of the evidence, it does not appear to have misled the jury into finding upon the issue otherwise than they would have found under proper instructions, and it is therefore their conclu-sion that under the provisions of section 319, C. O. S. 1921, the error should in the instant case be held to be harmless."

To the same effect are the following, among other cases: New York Life Ins. Co. v. Thompson, 181 Okla. 108, 72 P. 2d 713; Potts, Ex'x, v. Zolinger, 79 Okla. 262, 192 P. 1099; Chitwood v. Palmer, 101 Okla. 300, 225 P. 969; St. L. & S. F. Ry. Co. v. Loftus, 109 Okla. 141, 234 P. 607. Under the evidence in this case error in giving the instructions complained of is harmless.

2. It is admitted that the release to Harold Richard Bennett by Merna Grace Thomas and her husband, Henry James Thomas, of her contract interest in the purchase by Bennett of one-half of the beneficial portion of Nola Frances Canning in the trust estate, although dated April 5, 1948, was actually executed, if at all, on Sunday, April 4, 1948; that the signing thereof was not before a notary public; that the signing parties did not then or thereafter go before a notary public and acknowledge the release.

The authenticity of the signature has already been decided herein adversely to the contention of appellants, but appellants further argue that the signing of the release on Sunday was in violation of the Sunday laws—21 O. S. A. §908; that the Sunday contract was not thereafter ratified on a secular day, and is therefore invalid.

It is well established that a contract, even with reference to real estate, although not acknowledged, may be good as between the parties, but the execution of a business contract on Sunday presents a different problem. Our court has consistently held that an executory contract made on Sunday is invalid and unenforceable unless subsequently ratified on a secular day. See Harris v. Cooper, 203 Okla. 678, 225 P. 2d 820. In the leading Oklahoma case, A. Helm & Son v. Briley, 17 Okla. 314, 87 P. 595, the court had before it a contract entered into on Sunday and subsequently ratified on a week day, but the court

in that case made use of the following language which seems pertinent here:

"The sale of the mule and the * * * execution of the note was 'public traffic' within the intent and meaning of the law, and therefore in direct violation of it, and, this being granted, neither party * * * is entitled to receive any aid at the hands of the courts, unless there shall be found something in the transaction which brings it within some one of the exceptions and reservations contained in the statute, or such subsequent recognition of the contract as will work its affirmance and give it vitality."

And the general rule seems to be that, even though in some states an executory contract made in violation of the Sunday laws, and not thereafter ratified on a week day, may be set aside by the courts in an appropriate action by one of the parties to the contract, yet, as to a fully executed Sunday contract, the parties thereto being in pari delicto, neither of them will be afforded any judicial relief. The rule announced by a majority of the courts in states having Sunday statutes of equal or greater stringency than ours, is epitomized in 60 C.J., Sunday, §69, p. 1102, as follows:

"* * * And thus a contract made and performed on the same Sunday, although illegal as serving as the basis of any further rights, will nevertheless not be disregarded at the instance of either party thereto, since, both being in pari delicto, neither will be relieved by the court from the position in which he finds himself."

In the case of Herron v. Beck, 231 Ala. 328, 164 So. 904, the Supreme Court of that state was dealing with a deed which had been executed and delivered, and the consideration fully paid, on a Sunday, in violation of the Alabama law, which declared that "all contracts made on Sunday, unless for the advancement of religion, or in the execution or for the performance of some work of charity, or in case of necessity, * * * are void". But as to this fully executed Sunday contract, the court said:

"It is an illegal and immoral transaction, though not malum per se, and participated in by both parties, and neither can have any * * * relief against the other in respect to the transaction. Lansford v. 1st Nat. Bank, 224 Ala. 679, 141 So. 673; Thornhill v. O'Rear, 108 Ala. 299, 19 So. 382, 31 L. R. A. 792; Ramey v. Capps, 22 Ala. 288, 292; Burns & Co. v. Moore & McGee, 76 Ala. 339."

In Wilson v. Calhoun, 170 Iowa 521, 151 N.W. 1087, the Supreme Court of Iowa, dealing with a similar situation, held:

"The transaction was fully executed, and neither party may rescind and recover back the property or the purchase price, because the deed was signed and delivered on Sunday. Kelley v. Cosgrove, 83 Iowa 229, 48 N. W. 979, 17 L. R. A. 779; Kinney v. McDermot, 55 Iowa 674, 8 N. W. 656, 39 Am. Rep. 191."

See, also, the following: Ellis v. Hammond, 57 Ga. 179; Rickards v. Rickards, 98 Md. 136, 56 Atl. 397; Harriman v. Bunker, 79 N.H. 127, 106 Atl. 499; Williams v. Philadelphia Rapid Transit Co., 257 Pa. 354, 101 Atl. 748; also other cases cited in the digest.

The release here involved was a contract executed and delivered on Sunday in violation of the law; but it was fully executed by both parties on that same Sunday; nothing was left to be done with reference thereto by either party. Both parties were in equal wrong, and neither will be granted any relief from the other as respects the contract.

Moreover, the actual extinction of the Thomas interest in the beneficial share of the estate purchased from Mrs. Canning, apparently took place, not at the time this release was executed, but on May 8, 1943, when she accepted, endorsed and cashed a check signed by H. R. Bennett, for the sum of $189.40, with the notation thereon: "Settlement in full on Nola Canning 9% int. in C. C. Bennett estate." The evidence shows, without objection or dispute, that this was a repayment to Mrs. Thomas of

the entire amount she had paid on the obligation assumed by her for one-half of the 9%- interest transferred by Mrs. Canning to Bennett, and in full settlement of her claim to any interest therein. The evidence further shows that after that time all dividends paid by the trustee thereon were paid to Bennett; and that during the entire time from May 8, 1943, until the answer of Henry James Thomas was filed in this case on January 6, 1949, neither Merna Grace Thomas nor her husband, Henry James Thomas, ever claimed any right or title to this interest, or to the dividends therefrom or partial distribution thereof, or objected in any way to all of such dividends and distributions being paid by the trustee to Harold Richard Bennett. In our opinion, such a long period of acquiescence works an estoppel.

3. The trust estate consisted of real and personal property, and included valuable oil and gas leases. Merna Grace Thomas, one of the cestuis que trust, died without issue, and the court held in effect that the unpaid portion of the beneficial interest she had not sold should be distributed to the Bennetts, whom the trial court found to be the only beneficiaries interested in the estate at the time of the death of Mrs. Thomas. Appellants present the theory that oil and gas leases are "consumable personal property"; that a life estate with remainder over cannot be created in such property; that therefore Mrs. Thomas took absolute title to her beneficial interest immediately upon the death of the testator, and that upon her death, her husband, Henry James Thomas, became entitled to have one-half of her unsold interest set over to him.

Under the terms of the will and codicil legal title was vested in the trustee, but the beneficiaries had a conditional equitable interest which ripened into absolute title to that portion of income and corpus of the trust paid to them, but with respect to any unpaid portion, was subject to be defeated as to any beneficiary who, during the life of the trust, died without issue. We cannot agree that this was not a valid testamentary disposition of both real and personal property, including the oil and gas leases. In a long line of cases this court has held that an oil and gas lease in the usual form vests in the lessee an interest in the land, such an interest in real estate that an action to quiet title to the leasehold may be maintained. See Franklin v. Margay Oil Corp., 194 Okla. 519, 153 P. 2d 486, and the cases there cited.

Oil and gas leases are not considered "consumable personal property" even in the majority of the states where the common law "consumable personal property" rule obtains. Kentucky, having no statutory rule, recognizes the "consumable personal property" rule, and in the case of Davidson, Adm'r, v. Davidson, Adm'x, 149 Ky. 571, 149 S.W. 982, the Supreme Court of that state illustrates the types of personal property that are, and those that are not, considered "consumable personal property". In the syllabus the court said:

"A limitation over, on the death of one to whom chattels are bequeathed to be held, used and enjoyed by her during her life, is valid except as to such articles the use of which means their consumption.

"Within such rule, corn, wheat, shock fodder, sheaf oats, chickens and fat hogs, are classed as property consumed in its use; while a deposit in bank, sheep, horses, cows and calves, a threshing outfit, gristmill, blacksmith tools and farming implements are not."

Even in those states, recognizing the common-law rule, the term, "consumable personal property", is not considered synonymous with expendable, depletable or exhaustible personal property, or to include property which merely becomes obsolete or wears out. In Chase v. Howie, 64 Kan. 320, 67 P. 822, the question involved was whether by the terms of testator's will, his wife took a life estate or an absolute title

to certain money. The court held it to be a life estate with limitation over. The court said:

"A case analogous in its facts to the one at bar is that of Field v. Hitchcock, 17 Pick. 182, 28 Am. Dec. 288. The testator left $1,000 in cash which came into the hands of the executor, and the executor was in debt to the testator in the sum of $1,000. In the opinion the court said: 'It was contended in the argument for respondent that, as money was given to the wife for her life, and as money is a commodity consumed in its use, it must be deemed an absolute gift. This is certainly an extraordinary proposition. I have not the will before me, but I take its provisions to be this: that the testator gives his personal property, or the use of it, to his wife for her life, and then over to complainant. I take it that nothing is now better settled that such a gift is a gift of the interest only, and, if no trustee is specially named, it is the duty of the executor to invest the money and pay the interest only to the person entitled for life, and preserve the principal for him who is entitled to take afterwards.'"

In appellant's reply brief, they shift position by arguing that, since the products of an oil and gas lease give to it its value and since those products—oil and gas—are highly consumable personal property, the lease itself should also be considered consumable personal property. However, the products of a farm, cotton, corn, wheat and other crops, when grown and harvested are highly consumable, but that fact does not change the status of the farm. Neither the farm nor the oil and gas leasehold becomes consumable because the products therefrom have such a status.

This court has never passed directly upon this proposition. However, in the Margay Oil Corporation case, supra, we recognized the validity of a similar trust provision relating to oil and gas leases, and in Waldon v. Baker, 184 Okla. 492, 88 P. 2d 352, we recognized the validity of a similar method of disposing of property by will, though no

trust was involved. In the latter case we said:

"A remainder in fee limited to the children or the heirs of life tenant's body, though such heirs be unborn at the time of the grant, is recognized by statute as a valid grant. Sec. 11766, O. S. 1931, 60 Okla. St. Ann. §41. A remainder made contingent upon the failure of such heirs cannot vest until such failure becomes a settled fact. The latter is a contingent remainder and may not vest until failure of surviving issue of life tenant becomes certain. Sec. 11756, O. S. 1931, 60 Okla. St. Ann. §31."

However, our statute, 60 O. S. A. §175.2, would seem to settle the question. It reads:

"A trust in relation to real and personal property, or either of them, may be created for any purpose or purposes for which a contract may be made."

Certainly, a contract could be entered into by three parties whereby one of the parties would contract to convey one interest in personalty to the second party and the final interest to a third party.

Moreover, we again find a situation of delayed action. Mrs. Thomas, by selling a portion of her beneficial interest under the trust, and by accepting thousands of dollars of benefits under the trust, over a period of years, has ratified the trust by long acquiescence and by acceptance of benefits thereunder, and, if she were living, could not now be heard to question its validity; she being deceased, neither can her heirs be heard to complain.

4. The evidence does not bear out the contention that the appellant, Canning, was overreached by the trustee in the purchase by him, for the trust estate of the remainder of Mrs. Canning's interest for a consideration of $8,500.

Mrs. Canning, in her testimony, indicates that she received monthly reports as to the condition of the trust. Her letter to the trustee bank, dated

May 27, 1946, indicates a very clear understanding of the amount and value of the trust properties and of her share in the trust. In that letter, after calling the trustee's attention to the present status of the properties, and the price which had been paid her sister, Merna, for one-half of her sister's interest, Mrs. Canning offers to sell her remaining interest for $10,000 in cash and a house valued at $1,250. The bank at that time wrote that the trust was not in a position to make the purchase. In her letter of October 17, 1946, Mrs. Canning suggests that the trustee could borrow money to purchase her interest, and insists that the trust should be terminated and the properties sold. The bank, on October 21st, acknowledged the letter and asked Mrs. Canning what price she would take. In late November, A. D. Cochran, representing the bank, wrote Mrs. Canning that the bank had decided to offer $4,000 for half of her remaining interest, or $8,500 for all of it. Mrs. Canning accepted the $8,500 offer.

The testimony of Mrs. Canning and her letters, especially those in which she analyzes the condition of the estate, as well as the fact that she was engaged in a large decorating business at St. Petersburg, Florida, all indicate that Mrs. Canning was a woman of much more than the average business experience and judgment.

There is not a scintilla of evidence that the bank or its officers ever told Mrs. Canning anything about the estate that was not true; that is also the case with reference to her brother, Harold.

With reference to inadequacy of consideration, Mrs. Canning wrote to the bank that her remaining interest was worth $11,634, and she offered to take $11,250. The bank later offered her $8,500, and she accepted the bank's proposition. According to her own testimony, she knew there was inadequacy of consideration at the time she accepted it. She was therefore not misled. Even gross inadequacy of consid-

eration, standing alone, is not enough ground upon which to cancel a contract or to base rescission.

We do not think this contention is borne out by the evidence.

While, as we have already indicated, the trial is not free from error, appellant's rights have not been prejudiced thereby. Finding no reversible error, the judgment of the trial court should be affirmed.

This court acknowledges the services of Attorneys C. E. Hall, A. W. Gilliland, and J. I. Gibson, who as Special Masters aided in the preparation of this opinion. These attorneys were recommended by the Oklahoma Bar Association, approved by the Judicial Council, and appointed by the court.

HALLEY, V.C.J., and CORN, GIBSON, DAVISON, JOHNSON, O'NEAL, and BINGAMAN, JJ., concur.