Gary DENTON, Appellee,

v.

WINNER COMMUNICATIONS,
INC., Appellant.

No. 64010.

Court of Appeals of Oklahoma,
Division No. 4.

Sept. 9, 1986.

Sam T. Allen, IV, Loeffler & Allen, Sapulpa, for appellee.

Robert L. Locke, Jr., Robinson, Locke, Gage, Fite & Williams, Muskogee, for appellant.

BRIGHTMIRE, Presiding Judge.

Was the Sunday sale of stallion Pie In The Sky's stud services rendered legally impotent by the Oklahoma Sabbath Breaking statute?

The trial court did not directly decide the issue before rendering judgment for the purchaser on a jury verdict against the seller. The latter appeals.

We affirm.

## I

Plaintiff, Gary Denton, resides in Creek County and is in the business of buying, selling, raising, training and racing horses for profit. On Sunday, April 15, 1984, he attended a horse auction being staged at the Tulsa County State Fairgrounds. During the day plaintiff stopped at a booth operated by defendant, Winner Communications, Inc., where defendant admits it was "engaged in selling contracts for breedings, or stud services, to two horses, namely, Truckle Feature and Pie In The Sky" through its employee and agent, Andy Bretz. Defendant further admits a transaction took place involving the purchase by plaintiff of three breedings to Truckle Feature and four to Pie In The Sky and that it received two checks from plaintiff totaling $20,000. The next day, however, Winner repudiated the contract and the purchaser brought this action to recover compensation in the amount of $30,000 for the detriment he sustained as a result of defendant's breach of the contract.[1]

Defendant filed an amended answer on October 25, 1984, in which the sole defense advanced was that it only authorized its agent Bretz to take orders and submit them to defendant for approval; that he did; that when plaintiff's offer was submitted, defendant declined to approve it, and therefore no contract was ever consummated.

At pretrial held on December 20, 1984, Winner stated that the only issues of fact to be tried were those related to the extent of its agent's authority to "negotiate price for sale of multiple breedings to studs" and whether "plaintiff's offer [was] ever accepted by defendant." Defendant further stipulated that the only issue of law to be resolved at trial was whether plaintiff—if a contract was entered into—was entitled to specific performance. The trial judge signed an order stating that the admissions and determinations made at the pretrial session, "shall control the course of the trial", and set the trial for February 19, 1985.

The transcript discloses that defendant appeared on February 19 and asked for leave of court to amend its answer presumably to plead a Sabbath-breaking law defense. The court denied the request. For reasons not disclosed the case did not get to trial until February 21. On that day defendant appeared and orally asked the court for "a continuance in this matter on the grounds and for the following reasons: As I stated Tuesday [February 19], Defendant had discovered Title 21, Section 908 which was heretofore unknown to the Defendant [until] approximately ten days ago. I immediately brought that to the attention of the attorney for the Plaintiff.... I again ask ... for a continuance for the purpose of amending the pleadings and the pre-trial conference order." The trial judge declined to grant a continuance or to amend the pretrial order and ordered the trial to proceed.

---

1. A second cause sounding in tort was pleaded against agent Bretz but it was dismissed prior to trial.

Both parties adduced evidence and rested. The jury found that a contract was made on April 15, 1984, which was breached by defendant, and returned a verdict in favor of plaintiff for $30,000, the amount prayed for. Judgment was entered on the verdict. Defendant appeals contending its motion for a directed verdict should have been sustained for three reasons: (1) the contract was unenforceable under the provisions of 21 O.S.1981 §§ 907 and 908 because it was entered into on a Sunday; (2) plaintiff failed to present evidence of any detriment; and (3) no contract was ever entered into because defendant Winner Communications never "accepted Plaintiff's offers to purchase" the breedings in question.

## II

Winner's first contention is premised on the conclusion that the contract in question was executed in violation of the Oklahoma Sabbath-breaking law [2] and was therefore unenforceably unlawful under the provisions of 15 O.S.1981 § 211.[3]

Defendant points to decisions of the Court of Criminal Appeals upholding the constitutionality of the statutes insofar as they seek to impose a weekly day of "rest." [4] But while this is true, the court has also condemned our Blue Laws insofar as they unconstitutionally impose a duty to observe Sunday in a religious sense.[5] Finally, Winner relies on a couple of civil decisions for the general propositions that all business transactions consummated on Sunday are voidable and subject to later disaffirmance or ratification.[6] The argument is that the contract in question was one forbidden by our Sunday Laws and if it was not void at its inception it became so upon being disaffirmed the next day.

 We disagree with defendant's reasoning and conclusion. Here we are dealing with a criminal statute and this means the court is faced with several fundamental interpretive circumscriptions. To begin with, criminal statutes cannot be enlarged by implication and one cannot be guilty of a crime unless the challenged act is within both the letter and the spirit of the law. *City of Shawnee v. Landon,* 3 Okl.Cr. 440,

**2.** The so-called Sabbath-breaking law is a criminal statute last amended in 1983 to accommodate horse racing interests. It is found at 21 O.S. § 908 and reads:
"The following are the acts forbidden to be done on the first day of the week, the doing of any of which is Sabbath-breaking:
1. Servile labor, except works of necessity or charity.
2. Trades, manufactures, and mechanical employment.
3. All shooting, and horse racing or gaming except as authorized by the Oklahoma Horse Racing Commission pursuant to the provisions of the Oklahoma Horse Racing Act.
4. All manner of public selling, or offering or exposing for sale publicly, of any commodities, except that meats, bread, fish, and all other foods may be sold at any time, and except that food and drink may be sold to be eaten and drank upon the premises where sold, and drugs, medicines, milk, ice, and surgical appliances and burial appliances and all other necessities may be sold at any time of the day."
It is interesting to note that § 203.7 of the Oklahoma Horse Racing Act—Title 3A—directs that rules and regulations of the Commission "shall:
1. Encourage agriculture and the breeding of horses in this state."

Sabbath-breaking is defined by § 907 which says:
"The first day of the week being by very general consent set apart for rest and religious uses, the law forbids to be done on that day certain acts deemed useless and serious interruptions of the repose and religious liberty of the community. Any violation of this prohibition is Sabbath-breaking."

**3.** This statute provides:
"Those contracts are unlawful which are:
1. Contrary to an express provision of law.
2. Contrary to the policy of express law, though not expressly prohibited; or,
3. Otherwise contrary to good morals."

**4.** *Ex parte Johnson,* 77 Okl.Cr. 360, 141 P.2d 599 (1943). The rationale of this case is similar to that adopted later by the U.S. Supreme Court although it was met with a vigorous and soundly reasoned dissent by Justice Douglas in *McGowan v. State of Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

**5.** *Ex parte Hodges,* 65 Okl.Cr. 69, 83 P.2d 201 (1938).

**6.** *Canning v. Bennett,* 206 Okl. 675, 245 P.2d 1149 (1952); *Harris v. Cooper,* 203 Okl. 678, 225 P.2d 820 (1950).

106 P. 652 (1910). The terms of a penal statute must be sufficiently explicit to inform those subject thereto of exactly what conduct will render them liable to penalty. *Champlin Refining Co. v. Corporation Commission,* 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062 (1932). To avoid constitutional impairment an offense must be so clearly defined that any ordinary person can determine in advance what he may or may not do under the statute creating it. *Turner v. State,* 549 P.2d 1346 (Okl.Cr.1976); *Graham v. State,* 447 P.2d 200 (Okl.Cr.1968); *Cornelious v. Adkisson,* 394 P.2d 651 (Okl. Cr.1964).

An examination of the 1983 Sunday Laws discloses that not every contract executed or sale consummated on Sunday is a prohibited "Sabbath-breaking" criminal act. The statute—insofar as is relevant to the facts here—prohibits only "public *selling,* or *offering* or *exposing for sale* ... any *commodities,* except ... foods ... drugs, medicines, milk, ice, and surgical appliances...." (emphasis added). Buying or contracting to buy is not mentioned and may not be implicitly read into the statute.[7]

Secondly, we do not think the seller of the breedings committed a crime. The acts proscribed are the selling or offering for sale of "commodities"—a term which ordinarily brings to mind the thought of staples such as cotton, grain, pork bellies and the like, the futures of which are traded on commodity exchanges.[8] Even if considered in the broader sense of goods, wares and merchandise movable in trade or commerce, the ordinary person would not associate service contracts, particularly contracts for stud services, with the rather vague term "commodities." Indeed, the nature of the specified statutory exceptions are such as to convince us that the legislature did not intend the statutory prohibition to extend to service contracts. Per-

haps this vagueness of the term accounts for the wide range of commercial trade and employment which occurs nowadays on Sundays. That such activity is widely conducted with impunity often in full view of law enforcement officials cannot help but lead ordinary people to believe that those offering things and services for sale on Sunday have a legal right to do so and are not committing a criminal act.

 Thirdly, we notice that Winner's public offer to sell subject stud service was on county property and presumably with county approval. We are reluctant to conclude that the county would approve, seek to profit from, and indeed protect, lessees of the state fairgrounds property who are conducting such serious criminal activity as transgressing the Sabbath Law. We judicially notice that the county government authorizes its lessees to do all manner of things on Sunday—sell horses and breeding services, conduct flea markets, hold bankruptcy sales, and operate fairs—the activities of which consist of shooting, gaming, selling, and performance of servile labor and mechanical employment. And all these activities, particularly those at the fair, are often done under the personal observation and protection of the county sheriff.

Finally, the cases relied on by defendant are not helpful. Both were decided before the 1983 amendment of § 908, both deal with real estate, and neither discusses the meaning of the specific language of our current Blue Law statutes. Instead they rely on early decisions from this and other states construing language or statutes which differ materially from present state law. *Harris v. Cooper,* 203 Okl. 678, 225 P.2d 820 (1950), for instance, is premised on the Territorial case of *A. Helm & Son v. Briley,* 17 Okl. 314, 87 P. 595 (1906).

---

7. For a closely analogous situation see construction of our old intoxicating liquor laws. 37 O.S.1951 § 1 made it a crime to, among other things, "sell ... any liquors." It was held that § 1 did not make the purchase of intoxicating liquor a crime. *Brown v. State,* 266 P.2d 988 (Okl.Cr.1954).

8. The fact that specific statutes were enacted to prohibit the sale of cars on Sunday suggests that the term "commodities" was used in the more restrictive sense. *See* 21 O.S.1981 § 918.

*Briley,* after noting that the Sabbath Laws were penal in nature, pointed out that they had to be given a strict construction. The court then picked the title of the early anti-selling statute, "Public Traffic", to construe and said that a strict construction of that term required the court to hold that the sale of a mule on Sunday was "public traffic" and therefore "void". However, to accommodate the "moral sense of the people of this territory", the court grappled with the philosophical problem of whether it would be a "morally dishonest act for a debtor to refuse to pay a just debt because the evidence of it was executed on the Lord's Day." In holding it would be, the court opined that "Christians may differ very widely as to the proper outward manifestations of religious faith, but they cannot differ as to what are the essential elements of honesty or dishonesty, and it with these latter elements that temporal courts have to deal." The court introduced the legal theory of subsequent affirmance or ratification to enforce the note given on Sunday for the mule.[9]

The *Briley* interpretation of "public traffic" evidently became the basis for some obitur dicta in *Harris* to the effect that the intention of the legislature in enacting the Sunday anti-selling law in force in 1950 was to forbid "any secular business on Sunday." However accurate that appraisal of the law may have been in 1950, it is certainly inconsistent with the anti-selling provisions of our present-day Sunday Laws. Today's statutes allow people to carry on considerable "secular business on Sunday." For example, several exceptions are expressed in § 908(4) with regard to food, drink, etc. The prohibition on the "secular business" of shooting, horse racing, and gaming is now made subject to whatever exceptions the Oklahoma Horse Racing Commission wants to authorize, which for all we know may include a varie-

ty of "secular businesses" like, for example, pari-mutuel betting, horse trading and breeding. An exception to the servile labor ban is made in § 909 as a concession to the secular business needs of those whose religion calls for observing a "holy time" other than Sunday. In § 918 the sale of motor vehicles—property evidently not considered by the legislature as being within the scope of the term "commodities"—is the subject of a special prohibition with respect to the sale of motor vehicles on Sunday. And the prohibitions of § 918 are considerably circumscribed by extensive exceptions as qualified by definitions set out in § 917, by reason of which the secular sale of automotive parts, services, fuel and "[a]ntique, classic, or special interest automobiles ... are exempt" from the § 918 prohibition and may be sold by anyone on Sunday.

The other case relied on by defendant, *Canning v. Bennett,* 206 Okl. 675, 245 P.2d 1149 (Okl.1952), cites both *A. Helm* and *Harris* for support and introduces the concept of "pari delicto" with regard to fully executed Sunday contracts. It is said to be the "majority rule" and is supported by a quote from 60 C.J., *Sunday,* § 69 (1932), and an Alabama case construing an Alabama statute which declared outright that "[a]ll contracts made on Sunday ... are void" with certain exceptions such as those "for the advancement of religion." The pari delicto doctrine adopted was stated this way:

> "[A]s to a fully executed Sunday contract, the parties thereto being in pari delicto, neither of them will be afforded any judicial relief."

As we have seen, however, our statute differs substantially from those from which this general rule was derived, such as the Alabama law. Our Sunday Laws do not forbid all Sunday contracts or activities and with regard to sales, they only affect the sellers of a limited number of items in

---

9. The fact is that the term "Public Traffic" was not language in the early statehood statutes but a popular subject matter title placed by the codifier in front of the anti-selling statute. *See* R.L.1909, § 2065. We do not have the territorial statute in force in 1906 when the *Briley* opin-

ion was written but we assume it was the same as our 1909 statute. Since *Briley* went off on the interpretation of language not in any post-statehood Sabbath-breaking anti-selling law, it is of no help in construing our present-day law.

classifications the reasonableness of which is open to question. And because the laws do not make it a crime to purchase, the buyer cannot be in pari delicto.

■ We hold that the contract under consideration was not forbidden by the Blue Laws of this state nor was it otherwise unlawful or immoral within the meaning of our contract law and is therefore enforceable. Since defendant's motion for a directed verdict was not sustainable on the ground of an unlawful contract, it was properly overruled.

### III

Defendant's second attack—that the plaintiff failed to prove any detriment—is also without merit.

The argument is that the advertised price for the breedings in national trade journal ads placed by defendant should not have been allowed into evidence as proof of the fair market value of the breedings because (1) it is well known that a seller will ask more than market value for his property and (2) some breedings of the horses in question were sold at an auction for less than the amount of the advertised offer.

The general law is that the measure of damages for breach of an obligation arising from a contract is the amount which will compensate the aggrieved party for "all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." 23 O.S.1981 § 21. The factual situation seems to bring the case within the specific provisions of 12A O.S.1981 § 2–713 which authorizes a buyer, in the event of seller's non-delivery or repudiation of a contract, to recover the difference between the contract price and the market price together with incidental and consequential damages.

■ Here the subject matter of the contract was a service available only from or through defendant owner of the breeding rights in question rather than on the open market. Plaintiff testified that on April 16, 1984, he would have had to pay $5,000 per breeding by Pie In The Sky and $10,000 per breeding for Truckle Feature if he had gone to the farm where the horses were kept and bought them. These prices were corroborated by Winner's president who testified they were the nationally advertised ones but that Pie In The Sky's sire fees had gone up to $7,500. Thus there was sufficient evidence that the market price of the seven breedings plaintiff bought for $20,000 was $50,000 or a difference of $30,000—the amount awarded by the jury.

Plaintiff further testified that when defendant refused to deliver the breedings he bought he was unable to get his four mares bred, depriving him of four colts for the year, each of which would have been worth around $29,000. This was proof of consequential damage. The trial court, however, declined to allow plaintiff to amend his claim or prayer to conform to the evidence and if this was an error, it was one that inured to the benefit of defendant.

Since there was proof of some detriment—actually more than the amount awarded by the jury—defendant's motion for a directed verdict was not sustainable for the lack of evidence of damage.

### IV

Defendant's third attack on the sufficiency of plaintiff's evidence to support a prima facie case—that defendant's agent operating the booth, Andy Bretz, was without authority to unconditionally accept plaintiff's offer to purchase the breedings in question—must also be resolved against it.

■ Underlying this contention is the testimony of Bretz that he told plaintiff when he took plaintiff's check for $20,000, that he could not accept the offer and that it had to be approved by Winner's president.

Other evidence is, however, that the booth was set up at the horse auction to sell breedings of the two famous stallions in question. Admittedly Bretz was acting as Winner's agent and when asked by plaintiff about the price of the breedings Bretz said, "If you buy multiple breedings,

I can make a bigger bargain." Negotiations took place. Finally Bretz told plaintiff that if he would buy four breedings of Pie In The Sky, he could have them for $2,000 apiece. Plaintiff accepted the offer and wrote a check for $8,000 and handed it to Bretz who in turn executed a receipt and gave it to plaintiff. Further, at plaintiff's request Bretz wrote on the receipt that the breedings were guaranteed, that is, that the horse would be alive the following day until plaintiff had a chance to insure them. Bretz signed the guarantee and gave it to plaintiff. Plaintiff left and later returned to the booth to negotiate the purchase of three breedings by Truckle Feature for $4,000 each. Again Bretz accepted plaintiff's $12,000 check and executed a receipt with the same guarantee he had given in connection with the earlier purchase. At no time, said plaintiff, did Bretz say anything about the sale being contingent on anyone else's approval, but on the contrary at one point in the negotiations Bretz said the president of Winner told him to follow the price list on single breeding sales, but to use his own judgment in setting the price of multiple breeding sales.

Given this conflict in the evidence the issue regarding Bretz's authority became one issue for the jury to resolve and therefore there was no failure of proof in this regard which would warrant a directed verdict for defendant.

### V

The plaintiff's evidence was sufficient to support a prima facie case, and therefore defendant's motion for a directed verdict was properly overruled. The judgment appealed is affirmed.

BACON and STUBBLEFIELD, JJ., concur.