# Implementation of the Bid Protest Provisions of the Competition in Contracting Act

Certain provisions concerning bid protest procedures in the Competition in Contracting Act of 1984 (CICA) purport to authorize the Comptroller General (1) to require a procuring agency to stay a procurement until such stay is lifted by the Comptroller General; and (2) to require an agency to pay certain costs of a bid protest, including attorneys' fees and bid preparation costs. Because the Comptroller General is an agent of the Legislative Branch, the provisions authorizing the Comptroller General to act in an executive capacity to bind individuals and institutions outside the Legislative Branch violate fundamental separation of powers principles.

Although the only unconstitutional aspect of the bid protest stay provision concerns the Comptroller General's authority to lift the stay, this authority is inextricably bound with the stay provision as a whole. The stay provision is not, however, inextricably bound to the remainder of the CICA, and thus may be severed. Likewise, the provision authorizing the Comptroller General to require an agency to pay certain costs of a bid protest is severable from the remainder of the CICA.

Executive Branch agencies are advised to proceed with procurement processes as though no stay provision exists in the CICA, although agencies may voluntarily agree to stay procurements pending the resolution of bid protests if such action is not based on the authority of the invalid CICA stay provisions. Agencies should not comply with the Comptroller General's awards of costs under the invalid CICA damages provision.

October 17, 1984

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum responds to the President's request that this Department advise Executive Branch agencies regarding how they may implement the bid protest provisions of the Competition in Contracting Act of 1984 (CICA or Act), which was enacted as part of the Deficit Reduction Act of 1984. Pub. L. No. 98–369, 98 Stat. 494 (1984). In a signing statement on the Deficit Reduction Act, the President, on the advice of this Department, raised constitutional objections to certain provisions that delegate to the Comptroller General the power to perform duties that may not be carried out by the Legislative Branch. The President instructed this Department to advise Executive Branch agencies with respect to how they could comply with the Act in a manner consistent with the Constitution. This memorandum provides the advice requested by the President.

236

# I. Background

The new bid protest provisions were enacted as Subtitle D of the CICA. These provisions expressly permit any "interested party"[1] to file "[a] protest concerning an alleged violation of a procurement statute or regulation," and authorize the Comptroller General to decide such a protest under procedures to be established by the Comptroller General. *See* 31 U.S.C. § 3552. These provisions provide the first explicit statutory authorization for the Comptroller General's review of bid protests. Previously, all bid protests were considered on the basis of regulations published under the more general statutory provision that purports to authorize the Comptroller General to settle the accounts of the United States Government. *See id.* § 3526.

The CICA requires the Comptroller General to notify the federal agency involved in the protest, which is then required to submit to the Comptroller General a complete report on the protested procurement, "including all relevant documents," within 25 working days of the agency's receipt of notice. 31 U.S.C. § 3553(b). As a general rule, the CICA requires the Comptroller General to issue a final decision on a protest within 90 working days from the date the protest is submitted to the Comptroller General. These time deadlines, however, may be altered by the Comptroller General if he determines and states in writing that the specific circumstances of the protest require a longer period. The Act also provides for a so-called "express option" for deciding protests that the "Comptroller General determines suitable for resolution within 45 calendar days from the date the protest is submitted." Finally, the Comptroller General may dismiss a protest that the "Comptroller General determines is frivolous or which, on its face, does not state a valid basis for protest." 31 U.S.C. § 3554(a).

The Act expressly requires that if a protest is filed prior to a contract award, "a contract may not be awarded in any procurement after the Federal agency has received notice of a protest with respect to such procurement from the Comptroller General and while the protest is pending." 31 U.S.C. § 3553(c)(1). The procuring agency may avoid this "stay" only if the "head of the procuring activity" makes a "written finding that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General." The Comptroller General must be advised of this finding, and the finding may not be made "unless the award of the contract is otherwise likely to occur within 30 days thereafter." *See id.* § 3553(c)(3).

If a bid protest is filed within ten days after the date a contract is awarded, the procuring agency is required "upon receipt of that notice, immediately [to] direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by

---

[1] "Interested party" is defined as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551. (Citations to the new bid protest provisions are to the United States Code sections, as those sections are set forth in the CICA.)

the United States under that contract. Performance of the contract may not be resumed while the protest is pending." 31 U.S.C. § 3553(d)(1). As is true with respect to a pre-award protest, the head of the procuring activity may "waive" the stay upon a written finding that "urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." The Act provides an additional ground for waiver of a post-award stay upon a written finding "that performance of the contract is in the best interests of the United States." *Id.* § 3553(d)(2).

With respect to remedies, the Act authorizes the Comptroller General to determine whether a solicitation or proposed award complies with applicable statutes and regulations and, if not, to recommend that the procuring agency take certain specified types of action. The Act does not purport to give the Comptroller General the authority to issue binding decisions on the merits of the protest. The Act does, however, state that if the Comptroller General determines that a solicitation or award does not comply with a statute or regulation, the Comptroller General may declare an appropriate interested party to be entitled to the costs of "filing and pursuing the protest, including reasonable attorneys' fees" and "bid and proposal preparation." 31 U.S.C. § 3554(c)(1). In addition, the Act states that these monetary awards "shall be paid promptly by the Federal agency concerned out of funds available to or for the use of the Federal agency for the procurement of property and services." *Id.* § 3554(c)(2).

Finally, the Act requires the head of a procuring activity to report to the Comptroller General if the procuring agency has not fully implemented the Comptroller General's recommendations within 60 days after receipt of those recommendations. The Comptroller General is then required to submit a yearly report to Congress describing each instance in which a federal agency did not fully implement the Comptroller General's recommendations. 31 U.S.C. § 3554(e)(2).

The Department of Justice commented on similar bid protest provisions when they were under consideration by Congress as part of H.R. Rep. No. 5184. *See* Letter to Honorable Jack Brooks from Robert A. McConnell, Assistant Attorney General, Office of Legislative and Intergovernmental Affairs (Apr. 20, 1984). At that time, the Department specifically objected to the stay provisions on the ground that they would unconstitutionally vest an arm of the Legislature with the power to control Executive Branch actions. The Department specifically concluded that the stay provision "must be deleted because of this constitutional infirmity." In addition, the Department objected to the provision in H.R. Rep. No. 5184 purporting to authorize the Comptroller General to enter a legally binding award of attorneys' fees and bid preparation costs. We pointed out that this provision unconstitutionally granted the Comptroller General executive or judicial authority in a manner inconsistent with the separation of powers and that, accordingly, the section "must be deleted in order to remove this substantial concern." The Department's objections went unheeded, and both provisions were enacted into law.

When the Deficit Reduction Act of 1984 was presented to the President for his signature, he specifically objected in a signing statement to the bid protest provisions upon which the Department had previously commented:

> I am today signing H.R. Rep. No. 4170. In signing this important legislation, I must vigorously object to certain provisions that would unconstitutionally attempt to delegate to the Comptroller General of the United States, an officer of Congress, the power to perform duties and responsibilities that in our constitutional system may be performed only by officials of the executive branch. This administration's position on the unconstitutionality of these provisions was clearly articulated to Congress by the Department of Justice on April 20, 1984. I am instructing the Attorney General to inform all executive branch agencies as soon as possible with respect to how they may comply with the provisions of this bill in a manner consistent with the Constitution.

20 Weekly Comp. Pres. Doc. 1037 (July 18, 1984).

## II. The Constitutional Role of the Comptroller General

In order to analyze the constitutionality of the bid protest provisions of the CICA, it is necessary first to understand what types of functions the Comptroller General may (and may not) perform under the constitutionally prescribed separation of powers. This analysis first involves consideration of where the Comptroller General fits within the tripartite structure established by the Constitution. It is then necessary to determine, given the Comptroller General's place in that structure, what duties he may constitutionally perform.

*A. The Comptroller General's Position in the Tripartite Structure of the Federal Government*

The Office of Comptroller General of the United States was created by the Budget and Accounting Act of 1921. *See* 42 Stat. 23 (1921). The Budget and Accounting Act expressly stated that the Comptroller General is "independent of the executive departments." *Id.* Subsequent legislation made it clear that the Comptroller General is part of the Legislative Branch. The Reorganization Act of 1945 specified that, for purposes of that Act, the term "agency" meant any executive department, commission, independent establishment, or government corporation, but did not include "the Comptroller General of the United States or the General Accounting Office, which are a part of the legislative branch of the Government." 59 Stat. 616 (1945). The same provision was included in the Reorganization Act of 1949. *See* 63 Stat. 205 (1949). The Accounting and Auditing Act of 1950 declared that the auditing for the Government would be conducted by the Comptroller General "as an agent of the Congress." 64 Stat. 835 (1950).

Although the President nominates and, with the advice and consent of the Senate, appoints the Comptroller General, the President has no statutory right to remove the Comptroller General, even for cause. *See* 31 U.S.C. § 703 (1982). The Comptroller General is appointed for a fifteen-year term, but he may be removed either by impeachment or by a joint resolution of Congress, after notice and an opportunity for hearing, for "(i) permanent disability; (ii) inefficiency; (iii) neglect of duty; (iv) malfeasance; or (v) a felony or conduct involving moral turpitude." 31 U.S.C. § 703(e)(1). Given the breadth of the grounds of removal, particularly the terms "inefficiency" and "neglect of duty," Congress enjoys a relatively unlimited power over the tenure in office of the Comptroller General.[2]

This broad power of removal was intended to give Congress the right effectively to control the Comptroller General, as the following excerpts from the legislative history of the Budget and Accounting Act demonstrate:

> MR. FESS. In other words, the man who is appointed may be independent of the appointing power, and at the same time if the legislative branch finds that he is not desirable, although he may be desirable to the appointing power, the legislative branch can remove him?
>
> MR. HAWLEY. Yes . . . .

58 Cong. Rec. 7136 (1919).

> [I]f the bill is passed this would give the legislative branch of the Government control of the audit, not through the power of appointment, but through the power of removal.

*Id.* at 7211 (remarks of Rep. Temple).

On the basis of these statutory provisions, it has become generally accepted that the Comptroller General is an arm of Congress and is within the Legislative Branch. The Department of Justice has consistently taken the view that the Comptroller General is a "legislative officer." *See, e.g., Testimony of Lawrence A. Hammond, Deputy Assistant Attorney General, Office of Legal Counsel: Hearings before the Subcomm. on Legislation and National Security, House Comm. on Government Operations,* 95th Cong., 2d Sess. (1978). The courts have also reached the conclusion that the Comptroller General is "an arm of the legislature." *See Delta Data Systems Corp.* v. *Webster,* 744 F.2d 197, 201 n.1 (D.C. Cir. 1984); *M. Steinthal & Co.* v. *Seamans,* 455 F.2d 1289 (D.C. Cir. 1971). In addition, scholars and commentators have recognized the position of the Comptroller General within the Legislative Branch and his direct accountability to Congress. *See The United States Government Manual* at 40

---

[2] The Supreme Court has recognized that the power to remove an official is necessarily linked to the power to supervise and control the actions of that official. *See Humphrey's Executor* v. *United States,* 295 U S. 602, 627 (1935).

(1984/85); F. Mosher, *The GAO: The Quest for Accountability in American Government* (1979); Cibinic & Lasken, *The Comptroller General and Government Contracts*, 38 Geo. Wash. L. Rev. 349 (1970); R. Brown, *The GAO: Untapped Source of Congressional Power* (1970); Willoughby, *The Legal Status and Functions of the General Accounting Office of the National Government* (1927).

The extent of the Comptroller General's direct accountability to Congress is perhaps best demonstrated by publications of Congress itself and of the General Accounting Office (GAO), which the Comptroller General heads.[3] In 1962, the Senate Committee on Government Operations published a report that described the GAO as

> a nonpolitical, nonpartisan agency in the legislative branch of the Government created by the Congress to act in its behalf in examining the manner in which Government agencies discharge their financial responsibilities with regard to public funds appropriated or otherwise made available to them by the Congress and to make recommendations looking to greater economy and efficiency in public expenditures.

*Functions of the U.S. General Accounting Office*, S. Doc. No. 96, 87th Cong., 2d Sess. 1 (1962).

A recent publication of the GAO states that although the Comptroller General is appointed by the President with the advice and consent of the Senate, the Comptroller General has "line responsibility to the Congress alone." General Accounting Office, *GAO 1966–1981, An Administrative History* 84 (1981). The same publication states that while "the Comptroller General has been established by the Congress with a great measure of discretion in independent action, he is fully accountable to the Congress. The Congress has by law and by practice exercised its accountability in several different ways." *Id.* at 258. This direct accountability undoubtedly has an impact on the positions and conclusions the Comptroller General reaches on public issues. For example, the GAO has stated that "as an agent of Congress, GAO has always considered it inappropriate to question the constitutionality of a statute enacted by the Congress." General Accounting Office, *Principles of Federal Appropriations Law* 1–7 (1982).

Thus, the Comptroller General is unquestionably part of the Legislative Branch and is directly accountable to Congress. As part of the congressional establishment, the Comptroller General may constitutionally perform only those functions that Congress may constitutionally delegate to its constituent parts or agents, such as its own Committees. The scope of this power is discussed below.

---

[3] Because the Comptroller General and the GAO are both "a part of the legislative branch of the Government," we treat them as equivalents for the purposes of this constitutional analysis. *See* Reorganization Act of 1949, 63 Stat. 205 (1949).

## B. The Duties That May Constitutionally Be Performed by an Agent of the Legislative Branch

A fundamental organizing principle of the United States Constitution is the division of federal power among three branches of government. The term "separation of powers" does not appear in the Constitution nor does that concept manifest itself in one specific provision of the Constitution. The Supreme Court has emphasized, however, that the separation of powers "is at the heart of our Constitution," and the Court has recognized "the intent of the Framers that the powers of the three great branches of the National Government be largely separate from one another." *Buckley* v. *Valeo*, 424 U.S. 1, 119–20 (1976). "The principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted in Philadelphia in the summer of 1787." *Id.* at 124. "The very structure of the Articles delegating and separating powers under Arts. I, II, and III exemplifies the concept of separation of powers." *INS* v. *Chadha*, 462 U.S. 919, 946 (1983). In *The Federalist* No. 47, James Madison defended this tripartite arrangement in the Constitution by reference to Montesquieu's well-known maxim that the legislative, executive, and judicial departments should be separate and distinct:

> The reasons on which Montesquieu grounds his maxim are a further demonstration of his meaning. "When the legislative and executive powers are united in the same person or body," says he, "there can be no liberty, because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws to *execute* them in a tyrannical manner." Again: "Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be *the legislator*. Were it joined to the executive power, *the judge* might behave with all the violence of *an oppressor*."

*The Federalist* No. 47, at 303 (C. Rossiter ed. 1961) (emphasis in original); *see Buckley* v. *Valeo*, 424 U.S. 1, 120–21 (1976).

The division of delegated powers was designed "to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *INS* v. *Chadha*, 462 U.S. at 951. This division obliges the branches both to confine themselves to their constitutionally prescribed roles and not to interfere with exercise by the other branches of their constitutional duties. Thus, the doctrine of separation of powers "may be violated in two ways. One branch may interfere impermissibly with the other's performance of its constitutionally assigned function. Alternatively the doctrine may be violated when one branch assumes a function that more properly is entrusted to another." *Id.* at 963 (Powell, J. concurring) (citations omitted).

This constitutionally prescribed separation of powers is not merely a theoretical concept; it creates enforceable limits upon the powers of each branch.

242

The Supreme Court has emphasized that it "has not hesitated to enforce the principle of separation of powers embodied in the Constitution when its application has proved necessary for the decisions of cases or controversies properly before it." *Buckley* v. *Valeo*, 424 U.S. at 123. Thus, the separation of powers is a vital part of the structure of the Constitution and the federal government, and it operates as an enforceable limit on the ability of one branch to assume powers that properly belong to another.

At various times in the Nation's history, the Supreme Court has acted to restrain each of the other branches from overstepping its proper constitutional role. In particular, the Court has been sensitive to the need to limit Congress to the performance of its legislative duties and not permit it to usurp executive or judicial functions. The Court has observed that because of the Framers' specific concerns about the potential abuse of legislative power, "barriers had to be erected to ensure that the legislature would not overstep the bounds of *its* authority and perform the functions of the other departments." *United States* v. *Brown*, 381 U.S. 437, 444 (1965). In *Springer* v. *Philippine Islands*, 277 U.S. 189 (1928), the Court stated:

> Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions.

277 U.S. at 202.

In *Myers* v. *United States*, 272 U.S. 52 (1926), the Court held that Congress could not limit or interfere with the President's ability to remove executive officials:

> Article II excludes the exercise of legislative power by Congress to provide for appointments and removals, except only as granted therein to Congress in the matter of inferior offices . . . . [T]he provisions of the second section of Article II, which blend action by the legislative branch, or by part of it, [Senate advice and consent] in the work of the executive, are limitations to be strictly construed and not to be extended by implication . . . .

272 U.S. at 164.

In *Buckley* v. *Valeo*, the Court ruled that Congress was barred by the Appointments Clause from appointing Officers of the United States, whom it defined as those "exercising significant authority pursuant to the laws of the United States." 424 U.S. at 126. In so holding, the Court expressly recognized that Congress' broad power under the Necessary and Proper Clause extends only so far as its legislative authority, and does not expand that authority to encompass the exercise of executive powers:

> The proper inquiry when considering the Necessary and Proper Clause is not the authority of Congress to create an office or a

243

commission, which is broad indeed, but rather its authority to provide that its own officers may make appointments to such office or commission.

So framed, the claim that Congress may provide for this manner of appointment under the Necessary and Proper Clause of Art. I stands on no better footing than the claim that it may provide for such manner of appointment because of its substantive authority to regulate federal elections. Congress could not, merely because it concluded that such a measure was "necessary and proper" to the discharge of its substantive legislative authority, pass a bill of attainder or *ex post facto* law contrary to the prohibitions contained in § 9 of Art. I. No more may it vest in itself, or in its officers, the authority to appoint Officers of the United States when the Appointments Clause by clear implication prohibits it from doing so.

*Id.* at 134–35.

Finally, the Supreme Court has most recently and thoroughly considered the scope of Congress' authority to act other than by plenary legislation in *INS* v. *Chadha.* In *Chadha,* the Court declared unconstitutional a one-house legislative veto provision. In so doing, the Court underscored the constitutional requirement that, in order for Congress to bind or affect the legal rights of government officials or private persons outside the Legislative Branch, it must act by legislation presented to the President for his signature or veto:

The decision to provide the President with a limited and qualified power to nullify proposed legislation by veto was based on the profound conviction of the Framers that the powers conferred on Congress were the powers to be most carefully circumscribed. It is beyond doubt that lawmaking was a power to be shared by both Houses and the President.

462 U.S. at 947. When Congress takes action that has *"the purpose and effect of altering the legal rights, duties and relations of persons . . . outside the Legislative Branch,"* it must act by passing a law and submitting it to the President in accordance with the Presentment Clauses and the constitutionally prescribed separation of powers. *Id.* at 952 (emphasis added). The Court emphasized that "when the Framers intended to authorize either House of Congress to act alone and outside of its prescribed bicameral legislative role, they narrowly and precisely defined the procedure for such action." *Id.* at 955.[4]

---

[4] As the Court noted, there are only four provisions in the Constitution by which one House may act alone with the unreviewable force of law, not subject to the President's veto: the power of the House of Representatives to initiate impeachment; the power of the Senate to try individuals who have been impeached by the House; the power of the Senate to approve or disapprove Presidential appointments; and the power of the Senate to ratify treaties negotiated by the President. *See* 462 U.S. at 955.

Finally, with respect to Congress' power over the Legislative Branch, the Court concluded:

> One might also include another "exception" to the rule that congressional action having the force of law be subject to the bicameral requirement and the Presentment Clauses. Each House has the power to act alone in determining specified internal matters. Art. I, § 7, cls. 2, 3, and § 5, cl. 2. However, this "exception" *only empowers Congress to bind itself* and is noteworthy only insofar as it further indicates the Framers' intent that Congress not act in any legally binding manner outside a closely circumscribed legislative arena, except in specific and enumerated instances.

*Id.* at 955 n.21 (emphasis added).

These principles have never been directly applied by a court to establish the constitutional limits on Congress' authority to assign duties to the Comptroller General. In particular, we are aware of no court decision that has ever held that the Comptroller General may constitutionally perform executive duties or take actions that bind individuals outside the Legislative Branch.[5] Some courts have, in *dictum*, noted that the Budget and Accounting Act purports to give the Comptroller General broad power to bind the Executive Branch. *See United States ex rel. Skinner & Eddy Corp.* v. *McCarl*, 275 U.S. 1 (1927); *United States ex rel. Brookfield Constr. Co.* v. *Stewart*, 234 F. Supp. 94, 100 (D.D.C.), *aff'd*, 339 F.2d 753 (D.C. Cir. 1964). Other courts have stated, solely on the basis of statutory language and without considering any possible constitutional issues, that the Comptroller General's settlement of accounts is binding on the Executive Branch. *See United States* v. *Standard Oil Co.*, 545 F.2d 624, 637–38 (9th Cir. 1976); *Burkley* v. *United States*, 185 F.2d 267 (7th Cir. 1950); *Pettit* v. *United States*, 488 F.2d 1026 (Ct. Cl. 1973). In none of these cases, however, did the courts consider the scope of authority that could *constitutionally* be assigned to the Comptroller General or, specifically, whether the Constitution would permit the Comptroller General, as an agent of Congress, to take action affecting the rights or obligations of Executive Branch officials or private citizens.

Other cases have expressly recognized that, in the context of the Comptroller General's current review of bid protests, the authority of the Comptroller General is purely advisory and does not bind the Executive Branch. *See Delta Data Systems Corp.* v. *Webster*, 744 F.2d 197, 201 (D.C. Cir. 1984); *Wheelabrator Corp.* v. *Chafee*, 455 F.2d 1306, 1313 (D.C. Cir. 1971); *Aero Corp.* v. *Department of the Navy*, 540 F. Supp. 180, 206 (D.D.C. 1982);

---

[5] In *Buckley* v. *Valeo*, the Court noted that the Comptroller General "is appointed by the President in conformity with the Appointments Clause." 424 U S. at 128 n 165. This reference was not, however, an indication that the Comptroller General is authorized to perform executive responsibilities, but rather, simply responded to an argument made by Congress in *Buckley* that the Office of Comptroller General was precedent supporting Congress' asserted right to make certain types of appointments.

*Simpson Electric Co.* v. *Seamans*, 317 F. Supp. 684, 686 (D.D.C. 1970). Indeed, the United States Court of Appeals for the District of Columbia Circuit has recently recognized that there "might be a constitutional impediment to such a binding effect." *Delta Data Systems Corp.* v. *Webster*, 744 F.2d at 201 n.1 (citing *INS* v. *Chadha*).

We believe that if a court were to apply the separation of powers principles discussed above to establish the constitutional role of the Comptroller General, it would limit the Comptroller General to those duties that could constitutionally be performed by a congressional committee. Thus, under the above principles, the Comptroller General may not act in an executive capacity, and he may not take actions that bind individuals and institutions outside the Legislative Branch. He may advise and assist Congress in reviewing the performance of the Executive Branch in order to determine if legislative action is desirable or necessary. He may not, however, substitute himself for either the executive or the judiciary in determining the rights of others or executing the laws of the United States. Our analysis of the bid protest provisions of the CICA is based upon these conclusions.

## II. The Constitutionality of the Bid Protest Provisions of the CICA

Given the foregoing constitutional principles, there are two provisions of the CICA that raise significant constitutional problems: (1) the provision requiring a procuring agency to stay a procurement pending resolution by the Comptroller General of a bid protest; and (2) the provision authorizing the Comptroller General to require a procuring agency to pay certain costs, including attorneys' fees and bid preparation costs.

### A. *The Stay Provision*

Under the stay provision of the CICA, a procuring agency is required to suspend a procurement upon the filing of a bid protest until the Comptroller General issues his decision on the protest. Thus, the Comptroller General is given the power to determine when the stay will be lifted by the issuance of his decision on a bid protest. As a practical matter, the Comptroller General could effectively suspend any procurement indefinitely simply by delaying for an indefinite period his decision on a bid protest.

From a constitutional perspective, we find nothing improper in the requirement for a stay, in and of itself. Congress frequently requires Executive Branch agencies to notify Congress of certain actions and wait a specified period before implementing those actions. These so called "report and wait" requirements were specifically recognized by the Supreme Court in *Chadha* as a constitutionally acceptable alternative to the legislative veto. *See* 462 U.S. at 955.

The problem in this instance arises from the power granted to the Comptroller General to lift the stay. The CICA gives the Comptroller General, an agent

of Congress, the power to dictate when a procurement may proceed. This authority amounts, in *Chadha's* words, to a power that has the "effect of altering the legal rights, duties and relations of persons . . . outside the legislative branch." *See* 462 U.S. at 952. As a constitutional matter, there is very little difference between this power and the power of a legislative veto.

A similar issue was raised in *American Fed'n of Gov't Employees* v. *Pierce*, 697 F.2d 303 (D.C. Cir. 1982). In that case, the court of appeals considered the validity of a statute that required the Department of Housing and Urban Development to suspend any reorganization until it received approval from the House and Senate Committees on Appropriations. The court ruled that this provision could be interpreted simply as a form of legislative veto, but it also stated:

> The provision can also be taken as granting the Appropriations Committees the power to lift a congressionally imposed restriction on the use of appropriated funds. In this light, the directive is nothing more or less than a grant of legislative power to two congressional committees. It is plainly violative of article I, section 7, which prescribes the only method through which legislation may be enacted and which "restrict[s] the operation of the legislative power to those policies which meet the approval of three constituencies, or a super-majority of two."

*Id.* at 306; *see also Consumer Energy Council* v. *FERC*, 673 F.2d 425, 464 (D.C. Cir. 1982), *aff'd*, 463 U.S. 1216 (1983). Similarly, the grant to the Comptroller General of the power to lift the stay imposed under the CICA amounts to a grant of legislative power to an arm of Congress. This grant is clearly inconsistent with the principles established by the Supreme Court in *Chadha*, which were accurately anticipated by the U.S. Court of Appeals for the District of Columbia Circuit in *Pierce*.

A difficult problem is presented in this instance, however, by the question of the extent to which the unconstitutional provision is severable from the remainder of the CICA. In *Chadha*, the Court ruled that an unconstitutional provision is generally presumed to be severable. The Court outlined several guidelines with respect to evaluating this issue in a specific instance. First, the Court stated:

> Only recently this Court reaffirmed that the invalid portions of a statute are to be severed "'[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not'" *Buckley* v. *Valeo*, 424 U.S. 1, 108 (1976), quoting *Champlin Refining Co.* v. *Corporation Comm'n*, 286 U.S. 210, 234 (1932).

*INS* v. *Chadha*, 462 U.S. at 931–32. Thus, unless there are clear indications that Congress would have intended additional parts of a statute to fall because of the invalidity of a single provision, the invalid provision will be severed. Second,

the Court stated that a severability clause is strong evidence that Congress did not intend that the entire statute or any other part of it would fall simply because another provision was unconstitutional. 462 U.S. at 934. Finally, the Court stated that "[a] provision is further presumed severable if what remains after severance is 'fully operative as a law.' *Champlin Ref. Co.* v. *Corporation Comm'n, supra,* 286 U.S. at 234." *Id.* The severability issue must be analyzed in light of these principles.

The only aspect of the stay provision that is directly unconstitutional is the provision authorizing the Comptroller General to lift the stay by issuing his decision or finding that a particular protest is frivolous. If this provision alone were severed, the stay would remain in effect indefinitely because there would be no remaining statutory basis for terminating the stay. Although the statute could technically operate this way, as a practical matter this alternative would seem quite draconian because it would permit any bid protester effectively to cancel a procurement simply by filing a protest. It is clear that Congress did not intend such a result when it adopted the CICA. *See* H.R. Rep. No. 861, 98th Cong., 2d Sess. 1436–37 (1984).

Alternatively, the stay provisions could be interpreted to require a mandatory stay for a set period of time in order to give the Comptroller General an opportunity to reach a decision on the bid protest. This period of time might be set at 90 working days, which is the period of time established by the CICA as the standard time within which the Comptroller General should issue his decision on a bid protest.

We do not believe, however, that such a reworking of the statute would be consistent with Congress' intent. First, such a construction would involve essentially a redrafting of the stay provision rather than simple severance of the offending sections. Second, and more important, it would mean that any time a bid protest were filed, a procurement would automatically be delayed for 90 working days. Thus, any interested party who might be able to file a protest, however ill-founded, could prevent a procurement for a not insubstantial period of time.

We do not believe that Congress intended the bid protest process to be subject to such potential manipulation.[6] In fact, Congress expressly included the provision granting the Comptroller General the power to dismiss frivolous protests precisely in order to avoid this potential abuse. The conference report stated:

> The conference substitute provides that the Comptroller General may dismiss at any point in the process a filing determined to be

---

[6] We are informed by representatives of the Department of Defense that there would be a significant question concerning the proper allocation of costs incurred by an otherwise successful bidder during any period in which a stay were in effect. If Congress desires to enact a bid-protest system in which frivolous protests stay the award of a contract for 90 days (or any other set period of time), thereby potentially increasing the ultimate cost to the Government of a procurement because the original, successful bidder will have to pass on to the Government the costs incurred because of the delay, Congress may do so We would not, however, assume an intent on the part of Congress to do so; if Congress intends to legislate such an arguably inefficient procurement system, we believe it should be required to do so expressly in order to provide for the political accountability that is built into our constitutional system.

248

> frivolous or to lack a solid basis for protest. This provision reflects the intent of the conferees to keep proper contract awards or due performance of contracts from being interrupted by technicalities which interested parties in bad faith might otherwise attempt to exploit.

H.R. Conf. Rep. No. 861, 98th Cong., 2d Sess. 1436–37 (1984). Given our conclusion that the provision permitting the Comptroller General to terminate the stay immediately in the case of a frivolous protest is unconstitutional, we do not believe that Congress would have intended for all contracts to be delayed for any set period of time simply upon the filing of a protest, regardless of the good faith of the protester or merit of the protest. Therefore, because the provisions permitting the Comptroller General to terminate the stay must be severed from the statute, we believe that the entire stay provision must be stricken as well.[7]

This result is consistent with the approach taken by the U.S. Court of Appeals for the District of Columbia Circuit in *American Federation of Government Employees* v. *Pierce*. In that case, as previously discussed, the court declared unconstitutional a provision that required a stay of any reorganization plan within HUD until two congressional committees had given specific approval. The court recognized that the only directly unconstitutional aspect of this statute was the section that gave the congressional committees the power to terminate the stay. 697 F.2d at 307. Although the court could have severed that provision alone from the statute and left the stay provision in effect, it determined that "the prohibition on HUD reorganization [was] 'inextricably bound' to the invalid committee approval device." *Id.* (citation omitted). In the present instance, the two provisions seem equally inextricably bound, and we believe that Congress would not have enacted the stay provision "in the absence of the invalidated provision." *See Consumer Energy Council* v. *FERC*, 673 F.2d at 442.

## B. The Provision for Awarding Attorneys' Fees and Bid Preparation Costs

The provision permitting the Comptroller General to award costs, including attorneys' fees and bid preparation costs, to a prevailing protester, and which purports to require federal agencies to pay such awards "promptly," 31 U.S.C. § 3554(c)(2), suffers from a constitutional infirmity similar to the one that afflicts the stay provision. By purporting to vest in the Comptroller General the power to award damages against an Executive Branch agency, Congress has attempted to give its agent the authority to alter "the legal rights, duties and relations of persons . . . outside the legislative branch." 462 U.S. at 952. That this authority is in the nature of a judicial power makes it no less impermissible for Congress to vest it in one of its own agents. Congress may no more exercise

---

[7] We have no doubt that, under the severability principles set forth above, the stay provision may be severed. The Act may operate perfectly well without the stay provision, and there is no indication that Congress would have wished the entire Act to fall if the stay provision were invalidated.

judicial authority than it may exercise executive authority. *See INS* v. *Chadha*, 462 U.S. at 961–62 (Powell, J., concurring). Although Congress may by statute vest certain quasi-judicial authority in agencies independent of Executive Branch control, *see Humphrey's Executor* v. *United States*, 295 U.S. 602 (1935), Congress may not vest such authority in itself or one of its arms, in clear violation of the constitutionally prescribed separation of powers.

Based on our discussion of the law of severability above, we believe that the damages provision is clearly severable from the remainder of the CICA. The remainder of the Act is unrelated to the damages provision and may clearly continue to operate fully as a law without the invalid provision. Moreover, we find no evidence, either in the statute or in its legislative history, to indicate that Congress would not have enacted the remainder of the CICA without the damages provision. Therefore, only the damages provision need be stricken from the statute.

We wish to emphasize that we do not question the validity of the remainder of the CICA, and, in particular, the general grant of authority to the Comptroller General to review bid protests. Congress may, consistent with the Constitution, delegate to a legislative officer the power to review certain Executive Branch actions and issue recommendations based upon that review. Thus, the Comptroller General may continue to issue decisions with respect to bid protests. In accordance with the principles discussed above, however, these decisions must be regarded as advisory and not binding upon the Executive Branch.

## Conclusion

In sum, we believe that the stay provisions of the CICA, now in 31 U.S.C. § 3553(c) and (d), are unconstitutional and should be severed in their entirety from the remainder of the Act. In addition, the damages provision contained in 31 U.S.C. § 3554(c) is similarly unconstitutional and should be severed from the rest of the CICA. Because these provisions are unconstitutional, they can neither bind the Executive Branch nor provide authority for Executive Branch actions. Thus, the Executive Branch should take no action, including the issuance of regulations, based upon these invalid provisions.

We recommend that Executive Branch agencies implement these legal conclusions in the following manner. First, with respect to the stay provisions, all executive agencies should proceed with the procurement process as though no stay provision were contained in the CICA. We recognize that, under the Federal Acquisition Regulation, executive agencies have voluntarily agreed to stay procurements pending the resolution of bid protests in certain circumstances. *See* 48 C.F.R. § 14.407 8(b)(4). Executive agencies may continue to comply with these and other applicable regulations. These regulations may not, however, be based upon the invalid authority of the stay requirements of the CICA.

With respect to the damages provision contained in 31 U.S.C. § 3554(c), executive agencies should under no circumstances comply with awards of

250

costs, including attorneys' fees or bid preparation costs, made by the Comptroller General. We would further recommend that executive agencies not respond to the Comptroller General on the merits of any application for a damage award except to state that the Executive Branch regards the damages provision as unconstitutional.

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*